FILED

10/29/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0075

DA 24-0075

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 246

VERNON K. STENSVAD,

Plaintiff and Appellee,

v.

NEWMAN AYERS RANCH, INC.,

Defendant and Appellant.

APPEAL FROM: District Court of the Seventh Judicial District,
In and For the County of Prairie, Cause No. DV-2023-08
Honorable Olivia Rieger, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Shandor S. Badaruddin, Shandor S. Badaruddin, PC, Missoula, Montana

For Appellee:

Albert R. Batterman, Batterman Law Offices, P.C., Baker, Montana

Submitted on Briefs: September 25, 2024

Decided: October 29, 2024

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Newman Ayers Ranch, Inc. (Ayers Ranch) appeals an order of the Seventh Judicial District Court, Prairie County, granting Vernon K. Stensvad's (Stensvad) application for preliminary injunction.  We remand for supplemental findings consistent with the preliminary injunction standard.

¶2    We restate the following issues for review:

1. *Whether a district court must consider and make written findings on all four factors of the preliminary injunction standard, § 27-19-201, MCA.*

2. *Whether a preliminary injunction is an appropriate remedy to challenge an agister's lien.*

3. *Whether the District Court erred by finding that Stensvad did not have an adequate remedy at law.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    Stensvad owns a small cattle herd that he has selectively bred and developed since 2011.  In July 2022, Stensvad entered a Grazing Lease Contract with Ayers Ranch.  The Lease provided that Stensvad would graze his herd of approximately 84 cattle for $45 per animal unit with payment due at the beginning of each month.  The Lease stated that Stensvad would "be responsible for winter rates," which are typically higher than the summer pasture rates due to the cost of feed and care, but did not specify an amount.  The Lease could only be changed with discussion and written agreement by all parties.

¶4    Stensvad paid Lease fees for July and August.  Sometime after the Lease was created, Stensvad and Ayers Ranch came to an oral agreement that Stensvad would perform labor for Ayers Ranch in exchange for a reduction of fees.  The parties did not determine

2

an hourly rate that Stensvad would be credited. Stensvad worked approximately two weekends per month on Ayers Ranch until September 2023, repairing fences, moving hay, and repairing a trailer, though Ayers Ranch testified that the work was low quality and had to be redone. Stensvad made a $5,000 payment in May 2023 but did not otherwise pay monthly Lease fees.

¶5 In December 2022, a memo appearing to be written by Ayers Ranch was sent to Stensvad's Farm Services Agency Farm Loan Manager. That memo states:

1) Vern has 76 bred cows, 4 bulls, and 4 replacement heifers currently being feed [sic] on my ranch. The charge will be $2.50/day beginning November 15th. As of December 31st, he will owe $9,450 to New [sic] Ayers Ranch.
2) Vern pastured the cows on the ranch from early June on. I agree to allow Vern to work off the pasture for 2022 and 2023. I expect him to work every weekend at the ranch. He is in agreement to the terms of this arrangement.

Sincerely,

Newman Ayers Ranch
Courtney Ayers, President.

The memo is signed and dated by Stensvad, but Ayers Ranch asserts that it never saw the memo and was not aware of its existence until litigation began. Ayers Ranch testified that $2.50 per day was "not even close" to a reasonable winter rate and "wouldn't even pay for the cost of the hay."

¶6 On October 13, 2023, Stensvad informed Nancy Ayers, the ranch manager, that he was moving his animals at the end of the month and that Ayers Ranch would be paid after Stensvad sold his calves for the year. He also requested a bill. Instead of a bill, Stensvad received an agister's lien (Lien) claiming that he owed $78,662.50—an amount reflecting a winter rate totaling $55,312.50, much higher than the $2.50 per animal per day

3

memorialized in the memo—and no credit for Stensvad's labor. Pursuant to the agister's lien, Ayers Ranch seized Stensvad's entire herd and would not let him enter the property. The attached bill had significant discrepancies with the Lease and the Memo including number of animals, credit for Stensvad's labor, and winter rates. The parties dispute the amount owed.

¶7 On November 28, 2023, Stensvad filed a Verified Application for Preliminary Injunction and Temporary Restraining Order to prevent Ayers Ranch from selling Stensvad's animals pursuant to the Lien. A hearing was held on December 20, 2023. On January 8, 2024, the District Court granted the preliminary injunction and ordered Stensvad's animals to be moved to a third-party feed lot. Ayers Ranch appeals.

## STANDARD OF REVIEW

¶8 We review a district court's grant or denial of a preliminary injunction for manifest abuse of discretion. *Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 8, 418 Mont. 78, 555 P.3d 759. A court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 5, 409 Mont. 378, 515 P.3d 301. A manifest abuse of discretion is one that is obvious, evident, or unmistakable. *Shammel v. Canyon Res. Corp.*, 2003 MT 372, ¶ 12, 319 Mont. 132, 82 P.3d 912. We review a district court's factual findings for clear error and its legal conclusions for correctness. *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73.

4

# DISCUSSION

¶9     *1. Whether a district court must consider and make written findings on all four factors of the preliminary injunction standard, § 27-19-201, MCA.*

¶10     The 2023 Montana Legislature changed the standard for issuance of a preliminary injunction under § 27-19-201, MCA. Under the previous version of the statute, we employed a disjunctive test that required only one subsection to be met. *See Sweet Grass Farms v. Bd. of Cnty. Comm'rs*, 2000 MT 147, ¶ 27, 300 Mont. 66, 2 P.3d 825. Now, a party seeking a preliminary injunction must satisfy all four parts of the standard:

       (a) the applicant is likely to succeed on the merits;
       (b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;
       (c) the balance of equities tips in the applicant's favor; *and*
       (d) the order is in the public interest.

Section 27-19-201(1), MCA (emphasis added). "It is the intent of the legislature that [this language] mirror the federal preliminary injunction standard, and that interpretation and application . . . closely follow United States [S]upreme [C]ourt case law." Section 27-19-201(4), MCA. The parties to this appeal point out that "this Court has not yet reconciled this revised statutory approach with established case law." As a critical mass of cases applying the new preliminary injunction standard now reaches this Court, we take the opportunity to clarify the purpose, context, and application of this remedy.

¶11     The Supreme Court's most recent definitive ruling on the federal preliminary injunction standard was *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008). In *Winter*, the Supreme Court overturned the Ninth Circuit's grant of a preliminary injunction, clarifying that the factors were not just considerations but

5

rather separate showings that a plaintiff "must establish." *Winter*, 555 U.S. at 20, 129 S. Ct. at 374. The Court also held that plaintiffs must demonstrate a likelihood of irreparable injury—more than the Ninth Circuit's previous "possibility" standard. *Winter*, 555 U.S. at 21-22, 129 S. Ct. at 375.

¶12 Unfortunately for this Court, the Legislature's instruction to mirror Supreme Court case law is not as simple as merely applying the *Winter* factors.[1] *Winter* arose amid a diverse landscape of approaches to equitable relief and did little to alleviate confusion in its application. Both pre- and post-*Winter*, federal courts diverge on how to weigh the factors while accounting for the judicial discretion necessary to effectuate an equitable remedy. Now, like the federal circuits before us, this Court is tasked with determining what "Supreme Court case law" really means. To do so, we look to the history of the remedy and the approaches taken by various federal courts.

¶13 Equitable injunctive relief is grounded in old English law predating this state and this country by centuries. The history of the English legal system is long and far more nuanced than can or should be summarized in a judicial opinion. For purposes of understanding the roots of the preliminary injunction, it is worth noting that courts of law determined the rights of parties under highly specific causes of action (standardized writs) and awarded money damages, while courts of equity fashioned more tailored equitable relief with remedies, including injunctions, that were not available through courts of law.

---

[1] We use the term "factor" for consistency with Ninth Circuit case law and prevailing scholarly sources. The *Winter* ruling, depending on its interpretation, could also be construed as creating "elements," "steps," "prongs," or simply "parts."

This separate law and equity system originated in part because writs available in the courts of law were unworkably rigid in their requirements, leading parties to ask the king, via his chancellor, for new writs. These requests became so frequent and burdensome that the process was deputized to separate courts of equity. The courts of equity were often tasked with deciding whether injunctive relief should issue while a case was pending in the court of law. But because it was the court of law that determined the parties' legal rights, the court of equity had to decide its request based on its estimation of whether the plaintiff would ultimately succeed in the court of law, as well as the public interest and the balance of equities. The equity courts' injunctive power transferred to America post-Revolution. *See generally* John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv. L. Rev. 525, 527-31 (1978); Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 Wash. L. Rev. 429, 437-48 (2003).

¶14    As an equitable remedy, the hallmark of the preliminary injunction is its inherent flexibility—a court uses its discretion to "do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S. Ct. 587, 592 (1944). This flexibility—and the corresponding necessity of balancing various considerations against each other—is deeply rooted in American jurisprudence. *See, e.g.*, *Georgia v. Brailsford*, 2 U.S. 402, 407 (1792) (granting injunction where issues were a "fair foundation for future judicial investigation" and the possible harm might be "out of [the Court's] power to repair"); *Newton v. Levis*, 79 F. 715, 718 (8th Cir. 1897) ("When the questions to be ultimately decided are serious and doubtful, the legal discretion of the judge in granting the writ

7

should be influenced largely by the [balance of harms].”); *Blount v. Societe Anonyme du Filtre Chamberland Systeme Pasteur*, 53 F. 98, 101 (6th Cir. 1892) (quoting the old English case of *Shrewsbury v. Ry. Co.*, 1 Sim. (N.S.) 410) (“[T]here are two points on which the court must satisfy itself. First, it must satisfy itself, not that the plaintiff has certainly a right, but that he has a fair question to raise as to the existence of such a right. The other is whether ‘interim’ interference, on a balance of convenience or inconvenience to the one party and to the other, is or is not expedient.”).

¶15 By the time *Winter* was decided in 2008, the vast majority of federal courts followed a “sliding scale” test; that is, some version of variable weighting amongst factors. One common iteration of the sliding scale was the “serious questions” test, articulated in 1953 in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953):

> To justify a temporary injunction it is not necessary that the plaintiff’s right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

¶16 While the circuits’ language varied somewhat, more general sliding scale tests and the serious questions test (allowing for a lesser showing of success on the merits to be counterbalanced by other factors as long as the questions going to the merits were serious enough to make the matter fit for further litigation/investigation) were described as “equivalent approaches,” *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir. 1984), or as the Ninth Circuit put it, the serious questions test was “the outer reaches ‘of a single continuum’” of sliding scale approaches. *Regents of the Univ. of Cal. v. Am.*

8

*Broad Co.*, 747 F.2d 511, 515 (9th Cir. 1984) (internal citation omitted). Overall, there was a uniform acceptance that the remedy required an inherent allowance for judicial discretion.

¶17    But then *Winter* was decided. It neither addressed nor explicitly overruled the various sliding scale approaches, leaving the circuits to decide whether their respective tests survived. We examine several exemplary cases to broadly analyze the reasoning of the circuits that continue to follow a sliding scale approach and those that do not.

¶18    The Fourth Circuit quickly tightened its previously flexible test post-*Winter*. In *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated*, 599 U.S. 1089, 130 S. Ct. 2371 (2010), the court rejected that requirements could be "conditionally redefined as other requirements are more fully satisfied so that 'grant[ing] or deny[ing] a preliminary injunction depends upon a 'flexible interplay' among all the factors considered.'"[2] (Internal citation omitted.) Rather, the *Winter* requirements "must be satisfied as articulated." *Real Truth About Obama, Inc.*, 575 F.3d at 347.

¶19    The Tenth Circuit took a more circuitous route to tightening its standard, initially seeming to uphold the serious questions test before holding more recently that although *Winter* "dealt with a different prong of the preliminary injunction test" than likelihood of success, its reasoning meant that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016); *cf. RoDa*

---

[2] Though this case was vacated, the Fourth Circuit has since upheld its post-*Winter* interpretation of the preliminary injunction standard. *See Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013).

*Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 n.3 (10th Cir. 2009) (reaffirming serious questions test in a footnote). Essentially, these courts reason that anything less than an absolute showing of any one factor, even if balanced by a stronger showing on another factor, is a deviation from *Winter*'s requirements. A mere "serious question" going to the merits, then, is insufficient.

¶20    On the other hand, the Second, Seventh, D.C., and Ninth Circuits have expressly held that some version of the sliding scale test survives *Winter*.[3] The Second Circuit found that it was too broad a reading of *Winter* to require a showing that the movant "is more likely than not to succeed on its underlying claims"; rather, a movant must show either "likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Masters Fund, Ltd.*, 598 F.3d 30, 30-34 (2d Cir. 2010). The value of this approach is "its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup*, 598 F.3d at 35. The court reasoned that a rote requirement of likelihood of success would confine preliminary injunctions to "cases that are simple or easy," which would be "'unacceptable as a general rule . . . .Limiting the preliminary injunction to cases that do not present significant difficulties would deprive the remedy of much of its utility.'" *Citigroup*, 598

---

[3] The Third Circuit has implicitly upheld its sliding scale standard in the context of a stay pending appeal, *see Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 569-71 (3d Cir. 2015), and the First Circuit has avoided the issue despite recently being directly confronted with it in an environmental case, *see Sierra Club v. U.S. Army Corps of Eng'rs*, 997 F.3d 395 (1st Cir. 2021).

F.3d at 35-36 (quoting 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2948.3 (2d ed. 2009)). The court also discussed preliminary injunction cases around the time of *Winter*, finding that "[i]f the Supreme Court had meant for *Munaf* [*v. Geren*, 553 U.S. 674, 128 S. Ct. 2207 (2008)], *Winter*, or *Nken* [*v. Holder*, 556 U.S. 418, 129 S. Ct. 1749 (2009)] to abrogate the more flexible sliding scale standard for a preliminary injunction, one would expect some reference to the considerable history of the flexible standards applied in this circuit, seven of our sister circuits, and in the Supreme Court itself." *Citigroup*, 598 F.3d at 38.

¶21 The Seventh Circuit likewise acknowledged *Winter* but maintained its sliding scale approach. The court frames its test for success on the merits as "[h]ow strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins.*, 582 F.3d 721, 725 (7th Cir. 2009). Noting the uncertainties on the ultimate resolution of that case and the potential harm that would be avoided by an injunction, the court took a broad view to hold that "these uncertainties collectively support the . . . conclusion that [the plaintiff] has some prospect of prevailing on the merits." *Hoosier Energy*, 582 F.3d at 725, 729-30.

¶22 Similarly, the D.C. Circuit acknowledged that "the analysis in *Winter* could be read to create a more demanding burden, although the decision does not squarely discuss whether the four factors are to be balanced on a sliding scale." *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). Nonetheless, it set forth its sliding

11

scale approach—"[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor"—before finding the potential effect of *Winter* immaterial in that specific case because the plaintiffs could not prevail even under the sliding scale. *Davis*, 571 F.3d at 1292.

¶23    Perhaps most pertinent to our Court, the Ninth Circuit unequivocally has held that the serious questions version of the sliding scale test survived *Winter* in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). The court joined "the reasons identified by our sister circuits," namely the Second and the Seventh, as discussed above, "in concluding that the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*." *All. for the Wild Rockies*, 632 F.3d at 1134. The serious questions test is articulated as:

> A preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised[4] and the balance of hardships tips sharply in the plaintiff's favor.

*All. for the Wild Rockies*, 632 F.3d at 1134-35 (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). Plaintiffs must still satisfy the other *Winter* factors. Summarily, the Ninth Circuit held that

> [t]o the extent prior cases applying the "serious questions" test have held that a preliminary injunction may issue where the plaintiff shows only that serious

---

[4] If it is clear that there is not even a serious question going to the merits, then injunctive relief is not an appropriate remedy. In this sense, the likelihood of success is foundational—if there is not at least a serious question, a court need not continue its analysis, because a preliminary injunction would not be in the interest of equity. This is consistent with the Ninth Circuit's subsequent instruction that likelihood of success "is a threshold inquiry and is the most important factor." *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). But this should not be construed to somehow overvalue or heighten the showing of likelihood of success under the serious questions test.

questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, which requires the plaintiff to make a showing on all four prongs. But the "serious questions" approach survives *Winter* when applied as part of the four-element *Winter* test.

*All. for the Wild Rockies*, 632 F.3d at 1135. Thus, the Ninth Circuit explained that "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies*, 632 F.3d at 1135.

¶24 As the concurrence in that case recognized, *Winter* cabined a court's flexibility with regard to the irreparable harm finding to more than a possibility of harm, but "there are good reasons to treat the likelihood of success differently." *All. for the Wild Rockies*, 632 F.3d at 1139 (Mosman, J., concurring). Predicting the likelihood of irreparable harm is generally more possible at the preliminary injunction stage, whereas predicting the likelihood of success is much more difficult; "[t]he parties are often mostly guessing about important factual points that go, for example, to whether a statute has been violated, whether a noncompetition agreement is even valid, or whether a patent is enforceable." *All. for the Wild Rockies*, 632 F.3d at 1139-40 (Mosman, J., concurring). If the likelihood of success threshold is recognized as independent and therefore not cabined by *Winter*, the serious questions test easily survives.

¶25 We agree and hold that the serious questions test is the most appropriate means of applying the federal preliminary injunction standard. There are a number of reasons we choose to adopt the serious questions test. First, it is in accordance with Ninth Circuit case

13

law.  While we are not beholden to that court's precedent, we may review its opinions for guidance when federal cases or rules are implicated.  *See, e.g.*, *Mark Ibsen, Inc. v. Caring for Montanans, Inc.*, 2016 MT 111, ¶ 44, 383 Mont. 346, 371 P.3d 446 (analyzing U.S. District Court and Ninth Circuit cases for interpretation of the Montana Unfair Trade Practices Act); *Motta v. Granite Cnty. Comm'rs*, 2013 MT 172, ¶ 20, 370 Mont. 469, 304 P.3d 720 (adopting Ninth Circuit test for pre-filing orders against vexatious litigants); *State v. Case*, 2024 MT 165, ¶ 33, 417 Mont. 354, 553 P.3d 985 (explaining how the first two prongs of our community caretaker test mirror the Ninth Circuit's exigent circumstances standard for warrantless entry).  By paralleling the Ninth Circuit's application of the preliminary injunction standard, we hope to allow attorneys to draw from its case law, easing the transition to Montana's new standard.  Whether in state or federal court, Montana litigants will be served by the clarity of a consistent standard across venues.

¶26    Second, the serious questions test is the best fit with Montana precedent.  We have always emphasized the need for flexibility in the preliminary injunction context, as reflected by the disjunctive nature of the prior test.  *See Sweet Grass Farms*, ¶ 27.  We have held that "[i]n deciding whether an applicant has established a prima facie case, a court should determine whether a sufficient case has been made to warrant the preservation of the property or rights in status quo until trial, without expressing a final opinion as to such rights."  *Sweet Grass Farms*, ¶ 28 (citing *Fox Farm Estates Landowners Ass'n v. Kreisch*, 285 Mont. 264, 268, 947 P.2d 79, 82 (1997)).  The serious questions test continues to allow Montana courts to preserve the status quo until a full trial can be held without having to tread too far into the merits of the case.

14

¶27     Last, the serious questions test is the best fit with the overall equitable purpose of the remedy.   Preliminary injunctions are, and remain, "an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 9, 129 S. Ct. at 367.  If flexibility is a hallmark of equity jurisdiction, then some version of a sliding scale among the required factors is the means of allowing that flexibility.  It also alleviates concerns of judicial economy; if likelihood of success on the merits is an absolute standard, then district court judges and parties are effectively forced to conduct a trial on the merits without the benefit of full discovery.  This is harmful for numerous reasons and ultimately is not in the interest of justice.

¶28     In contrast to the uncertainty regarding application of the *Winter* factors, the United States Supreme Court, other federal courts, and this Court have remained resolute that the purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held."  *See Starbucks Corp. v. McKinney*, __ U.S. __, 144 S. Ct. 1570, 1576 (2024); *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)); *Planned Parenthood of Mont. v. State*, 2024 MT 228, ¶ 16, 418 Mont. 253, __P.3d __.

¶29     In summary, in accordance with *Winter*, the legislature's directive, and the plain language of the statute, the preliminary injunction standard sets forth a conjunctive test that requires an applicant to make a sufficient showing as to each of the four factors.  The sufficiency of that showing is determined using the Ninth Circuit's serious questions framework.  Unless it is clear that an applicant fails to raise serious questions going to the

15

merits, a district court should likewise consider and address each of the remaining factors. The ultimate equitable purpose of injunctive relief remains preservation of the status quo.

¶30 Turning to the case at hand, we hold that the District Court manifestly abused its discretion by granting a preliminary injunction without addressing all four factors. Though the District Court repeatedly acknowledged the necessity of addressing all four factors orally during the hearing and set out the correct test in its written order, it erred by only addressing irreparable injury. We make no finding as to whether a preliminary injunction should be granted or denied; we hold only that the District Court must make supplemental findings and conclusions upon remand to satisfy the applicable preliminary injunction standard.

¶31 *2. Whether a preliminary injunction is an appropriate remedy to challenge an agister's lien.*

¶32 Ayers Ranch argues that a preliminary injunction is not an appropriate remedy because statutory provisions govern agister's liens. Indeed, Ayers Ranch is an agister, and the lien arises as a matter of law. *See* § 71-3-1211(2)(a), MCA ("If there is an express or implied contract for keeping, feeding, herding, pasturing, or ranching stock, a rancher, farmer, [or] agister . . . to whom any horses, . . . cattle, . . . or other stock are entrusted has an agister's lien upon the stock for the amount due for keeping, feeding, herding, pasturing, or ranching the stock."). The relevant statute also provides that "agisters' liens require expeditious action to protect the welfare of the stock and to ensure that the cost to feed and care for the stock covered by the lien does not exceed the market value of the stock."

16

Section 71-3-1211(1), MCA. Section 71-3-1213, MCA, provides a process for public auction of the stock if payment is not provided within 30 days to the lienholder.

¶33 Ayers Ranch seemingly confuses the existence of a statutory remedy with an *exclusive* remedy. It is correct that public policy, market forces, and animal welfare encourage the "expeditious" resolution of such issues. But the statute does not suggest anywhere that § 71-3-1213, MCA, is an exclusive remedy. The language that the lienholder "may" enforce the lien by sale reflects its non-exclusive nature. Injunctive relief necessarily co-exists with statutory remedies "as an alternative or supplemental remedy to those ordinarily available by statute or common law." *Davis*, ¶ 23 (upholding a grant of injunctive relief where common law ejectment remedy also existed). Here, the public sale process for an agister's lien is not an exclusive remedy, nor is this one of the enumerated situations where injunctive relief is proscribed under § 27-19-103, MCA. Injunctive relief is therefore available.

¶34 *3. Whether the District Court erred by finding that Stensvad did not have an adequate remedy at law.*

¶35 Ayers Ranch argues that because "the nature of the dispute . . . is a breach of contract claim," Stensvad could be adequately compensated with monetary damages, rendering injunctive relief inapposite. But given Stensvad's alleged potential injury, we agree with the District Court that injunctive relief is an appropriate consideration.

¶36 Generally, Montana courts do not provide injunctive relief where monetary damages would adequately compensate harm. *Shammel*, ¶ 17. This is usually the case in contractual disputes. *See Reier Broad Co. v. Kramer*, 2003 MT 165, ¶ 15, 316 Mont. 301, 72 P.3d 944

17

("Injunctions are rarely used to enforce contract rights or prevent breaches, and applicable court decisions concerning the propriety of this tactic are scarce.").

¶37 Ayers Ranch asserts that this is a simple breach of contract claim ineligible for injunctive relief. But this is a rare factual circumstance where there is no underlying claim to date—there is only an application for preliminary injunction and temporary restraining order.[5] There may well be a breach of contract, but as Stensvad points out, there may also be negligence, fraud, and reputational harm. What matters is not the potential claim, but whether the alleged harm meets the preliminary injunction standard.[6] Again being mindful that we should not step into the fact-finding role of the District Court at this juncture, Stensvad has asserted injuries for which an adequate remedy does not exist at law.

## CONCLUSION

¶38 The District Court's decision is remanded for supplemental findings in accordance with this Opinion.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

---

[5] We have previously declined to address whether a party may seek injunctive relief under Title 27 without filing a complaint. *Protect the Clearwater v. Mont. Dep't of Env't Quality*, 2024 MT 181, ¶ 15, 417 Mont. 527, 554 P.3d 197. Because the parties do not raise this argument directly, we also decline to address it here.

[6] Of course, this does not extend to alleged harm where statute otherwise dictates that injunctive relief is not the appropriate remedy. *See* § 27-19-103, MCA (enumerating when an injunction may not be granted); *Protect the Clearwater*, ¶¶ 20-22 (holding that a separate preliminary injunction under Title 27 was not an appropriate remedy when other administrative remedies were available and pending in a separate suit).

18

Justice Jim Rice, specially concurring.

¶39 I agree with the Court's holding that the plain language of the agister's lien statutes does not preclude requests for injunctive relief pending completion of the lien foreclosure process. Opinion, ¶ 33. I would note, however, that the agister lien statutes contain a process that is intended to resolve these disputes expeditiously, including a process culminating in a hearing, § 71-3-1203(4), MCA, and thus, injunctive relief should be ordered only to supplement that process, not displace it. The Legislature has found that "agisters' liens require expeditious action to protect the welfare of the stock and to ensure that the cost to feed and care for the stock covered by the lien does not exceed the market value of the stock." Section 71-3-1211(1), MCA. Pursuant thereto, the Legislature has provided that a party who keeps, feeds, or pastures livestock pursuant to a contract for the provision of that care "has an agister's lien upon the stock for the amount due," and is granted the right to "retain possession of the stock until the amount due is paid." Section 71-3-1211(2), MCA. It is true, as Ayers Ranch argues, that the District Court ordered the livestock be removed from the possession of Ayers Ranch to a feed lot. Noting the factual conflicts regarding the parties' agreement and their purported actions pursuant thereto, the District Court ordered the livestock be placed in the care of a third party "pending further Orders from the court," but also ruled that Ayers Ranch's agister lien would remain in force until the issues surrounding the correct "amount due" could be sorted out factually, and authorized the sale of Stensvad's calves "to pay debts in order of first priority." Consequently, while Ayers Ranch lost possession of the livestock, which would usually be a part of the mechanism of enforcing the lien, the District Court's preliminary injunction

19

ensured the Ranch's lien would not be lost during the pendency of the proceeding, and ensured the livestock would be properly cared for. Given its protection of Ayers Ranch's claimed interest, I do not believe the District Court's coordination of supplemental injunctive relief with the agister's lien statutes was an error of law by itself. However, the District Court must nonetheless consider whether Stensvad qualifies for injunctive relief under the correct injunction statute.

¶40    I thus concur with the Court's holding, and as argued by Ayers Ranch, that the District Court erred by failing to analyze and apply the new preliminary injunction statute, § 27-19-201, MCA (2023), to this dispute, and that the case must be remanded for further consideration thereunder. The statements in the parties' briefing, that this Court "has not issued any opinions regarding the conjunctive or disjunctive nature" of the new statute or "has not yet reconciled" the new statute with prior case law, were made prior to the issuance of several recent decisions that now have done so. *See Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, 418 Mont. 78, 555 P.3d 759 (*MAID*); *Planned Parenthood of Montana v. State*, 2024 MT 227, 418 Mont. 226, ___ P.3d ___ (*Planned Parenthood I*); *Planned Parenthood of Montana v. State*, 2024 MT 228, 418 Mont. 253, ___ P.3d ___ (*Planned Parenthood II*). We held in these cases that, in contrast to the prior statute and as required by the new statutory language itself, the four statutory factors of the new injunction statute are conjunctive and a party seeking an injunction must satisfy all of them. *MAID*, ¶ 12 ("The prior version of the statute contained a disjunctive test. In other words, an applicant could obtain a preliminary injunction by showing proof of just one of the statutory subsections. . . . The current test is conjunctive. That is, the applicant for an

20

injunction bears the burden of establishing the likelihood of each element . . .”); *see also Planned Parenthood I*, ¶ 12; *Planned Parenthood II*, ¶ 12.  This Court also held that preservation of the status quo remains an appropriate consideration.  *Planned Parenthood I*, ¶ 16; *Planned Parenthood II*, ¶ 16 (“[I]t remains the case that ‘the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment issues in the cause.’”) (internal quotations and citations omitted)).

¶41    The Legislature uniquely provided in plain language the source of any further clarification of the new statute that may be necessary.  Section 27-19-201, MCA (2023), provides, in pertinent part:

> (1)  A preliminary injunction order or temporary restraining order may be granted when the applicant establishes that:
>
> > (a) the applicant is likely to succeed on the merits;
> >
> > (b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;
> >
> > (c) the balance of equities tips in the applicant's favor; and
> >
> > (d) the order is in the public interest.
>
> (4)  It is the intent of the legislature that the language in subsection (1) mirror the federal preliminary injunction standard, and that interpretation and application of subsection (1) *closely follow United States supreme court case law*.

Section 27-19-201(1), (4), MCA (2023) (emphasis added).  Consequently, courts are to look to and “closely follow” U.S. Supreme Court case law to guide the “interpretation and application” of the new four-part, conjunctive standard, and I would do so in adherence to

21

this express statutory directive. The Court instead holds that the new statute should be interpreted under the case law of the Ninth Circuit Court of Appeals. Opinion, ¶ 25.

¶42 The Legislature's intent to incorporate the U.S. Supreme Court's rulings in this area is further evidenced by the fact that the new four-part statutory standard restates *exactly* the substance of the four-part, conjunctive test stated in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). While the 2008 *Winter* opinion is generally regarded as the U.S. Supreme Court's seminal or modern statement of the test, the Supreme Court has explained that *Winter*'s statement is actually a summary of the "commonplace considerations applicable to cases in which injunctions are sought in the federal courts" and which "reflect a 'practice with a background of several hundred years of history.'" *Starbucks Corp. v. McKinney*, ___ U.S. ___, 144 S. Ct. 1570, 1576 (2024) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S. Ct. 1798, 1803 (1982) (quoting *Hecht Co.* v. *Bowles*, 321 U.S. 321, 329, 64 S. Ct. 587, 591-92 (1944))); *see also Georgia v. Brailsford*, 2 U.S. 402, 406 (1792) (opinion of Iredell, J.) and *Georgia*, 2 U.S. at 407 (opinion of Blair, J.). Further reflecting the test's long use and stability, the Supreme Court has described the *Winter* articulation as the "familiar standard" and the "default rule." *Starbucks Corp.*, 144 S. Ct. at 1575-76. In the 16 years since *Winter* was decided, the Supreme Court has not revisited the case for purposes of revising or supplementing the

test. Rather, the Supreme Court's citations to *Winter* have been for the purpose of stating the preliminary injunction test and its source.

¶43 The U.S. Supreme Court's application of the *Winter* test has instructed that "[a] preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp.*, 144 S. Ct. at 1576 (citing *Winter*, 555 U.S. at 24, 129 S. Ct. at 376). The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp.*, 144 S. Ct. at 1576 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834 (1981)). Our holding that the status quo remains an appropriate consideration under the new statute, *Planned Parenthood I*, ¶ 16, is consistent with this statement of purpose provided by the U.S. Supreme Court.

¶44 The U.S. Supreme Court commonly first analyzes the first factor, likelihood of success on the merits, which often includes the bulk of the Court's analysis in the case. *See Ramirez v. Collier*, 595 U.S. 411, 425-33, 142 S. Ct. 1264, 1277-82 (2022) ("Our conclusion that Ramirez is likely to prevail on the merits of his RLUIPA claims does not end the matter. As noted earlier, he must also show 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. at 375)). "'A stay is not a matter of right, even if irreparable injury might otherwise result.'" *Nken v. Holder*, 556 U.S. 418, 433, 129 S. Ct. 1749, 1760 (2009) (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672, 47 S. Ct. 222, 228 (1926)). "The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at

23

434, 129 S. Ct. at 1761 (noting the similarity between injunctive relief under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 8 U.S.C. § 1101 et seq., and the *Winter* test). Under the first factor, "[i]t is not enough that the chance of success on the merits be 'better than negligible'. . . . [m]ore than a mere possibility of relief is required." *Nken*, 556 U.S. at 434, 129 S. Ct. at 1761 (internal citations omitted). "By the same token, simply showing some 'possibility of irreparable injury' . . . fails to satisfy the second factor." *Nken*, 556 U.S. at 434-35, 129 S. Ct. at 1761 (noting that *Winter* had rejected "the 'possibility standard' as too lenient").

¶45 The Legislature adopted an exact re-statement of the *Winter* factors for the new statute. Section 27-19-201, MCA (2023). In applying those factors, the Legislature expressly required that courts are to "closely follow" U.S. Supreme Court case law. Section 27-19-201(4), MCA. The four-part *Winter* test provided by the U.S. Supreme Court is a straightforward test that has been applied consistently by the Supreme Court for many years, as set forth above. In its cases, the Supreme Court does not apply sliding scales or impose additional tests upon factors or require additional inquiries or employ approaches that may be used by the federal circuits or other courts. I thus respectfully disagree with the Court that "the Legislature's instruction to mirror Supreme Court case law is not as simple as merely applying the *Winter* factors." Opinion, ¶ 12. The Legislature presumably intended for the new statute to change the status quo of injunction law, and the Legislature's choice of language is consistent therewith. *See Sammons v. Sims (In re Guardianship of L.R.T.S.)*, 2023 MT 83, ¶ 37, 412 Mont. 157, 529 P.3d 854 (referencing "this Court's long-held presumption that the Legislature intended to make some changes

24

in existing law by enacting an amendment or new law"). The clarity of the U.S. Supreme Court's *Winter* jurisprudence is likely the reason the Legislature endorsed that particular body of precedent and expressly required that it be "closely follow[ed]." I believe this plain and specific directive does not leave room for application of alternate interpretive factors or tests formulated by other courts.

¶46 The *Winter* test and the U.S. Supreme Court cases decided thereunder provide a clear and settled framework of legal standards for district courts to apply and to discretionarily grant or deny injunctive relief in accordance with the evidentiary record made before them. I would so hold.

¶47 I specially concur.

/S/ JIM RICE