FILED

05/29/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0648

DA 23-0648

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 112

MONTANA ENVIRONMENTAL INFORMATION
CENTER and EARTHWORKS,

        Plaintiffs and Appellants,

  v.

OFFICE OF THE GOVERNOR FOR THE
STATE OF MONTANA,

        Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDV-2022-209
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Robert Farris-Olsen, David K.W. Wilson, Jr., Morrison Sherwood
Wilson Deola, PLLP, Helena, Montana

                Derf Johnson, Montana Environmental Information Center, Helena,
Montana

        For Appellee:

                Dale Schowengerdt, Timothy Longfield, Landmark Law, PLLC, Helena,
Montana

        For Amici Curiae Montana Freedom of Information Hotline, Montana
Newspaper Association, and Montana Transparency Project:

                Mikaela Koski, Constance Van Kley, Rylee Sommers-Flanagan, Upper
Seven Law, Helena, Montana

Submitted on Briefs:  January 31, 2025

Decided:  May 29, 2025

Filed:

_____
                              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Montana Environmental Information Center and Earthworks (collectively MEIC) appeal an order of the First Judicial District Court, Lewis and Clark County, denying MEIC's request for attorney's fees after it prevailed in a right to know dispute with the Office of the Governor (Governor's Office). We address the following restated issues on appeal:

1. *Whether a party who successfully vindicates its right to know under Article II, Section 9, of the Montana Constitution is entitled to a presumption towards awarding attorney's fees.*

2. *Whether an award of damages for a prevailing party in a mandamus action, including attorney's fees, is mandatory or discretionary.*

We vacate and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On November 29, 2021, MEIC delivered a formal information request under Article II, Section 9, of the Montana Constitution to the Governor's Office. It sought a wide array of information related to the Montana Department of Environmental Quality (DEQ)'s voluntary dismissal of its "bad actor" enforcement action against Hecla Mining and its President/CEO,[1] as well as information regarding the Governor's Office's involvement in mining and environmental decision-making generally. Specifically, MEIC's information request sought:

a. All documents, records, information, and materials regarding the Montanore and Rock Creek Mines;

---

[1] Under the Montana Mine Reclamation Act, a "bad actor" is precluded from obtaining an exploration license or operating a mine until contaminated sites are remediated and/or the state is reimbursed for its costs. *See* §§ 82-4-331(3), -335(9), MCA.

3

b. All documents, records, information, and materials regarding Montana's Bad Actor Provision in the Metal Mine Reclamation Act;

c. All communications which were generated, received, kept, referenced, and/or considered by the Office of the Governor and representatives, employees, shareholders, contractors, and/or other entities representing the interests of Hecla Mining and/or Phillips S. Baker, Jr. These communications may include (but this request is not limited to) the email domain @hecla-mining.com. This correspondence may also include, but is not limited to, employees of the consulting firm Environomics, Inc.;

d. All communications which were generated, received, kept, referenced, and/or considered by the Office of the Governor and DEQ concerning the permitting activities at the Montanore and Rock Creek Mines and/or enforcement of the Bad Actor Provision.

¶3 Around the same time, MEIC brought suit against DEQ and its newly appointed director, Chris Dorrington, in an effort to force DEQ to enforce the "bad actor" provision against Hecla Mining. *See Ksanka Elders Advisory Comm. v. Dorrington*, No. DV-21-1126 (Mont. First Jud. Dist. filed Nov. 10, 2021). MEIC argued that the information it sought in its request was relevant not only to the *Ksanka Elders* litigation, but also to understanding the Governor's Office's role in environmental regulation and mining; in turn, this information would inform MEIC's lobbying activities, government accountability goals, and public education objectives.

¶4 The Governor's Office did not respond to MEIC's November request.[2] MEIC followed up multiple times in January 2022, and the Governor's Office noted that it would look into the request. When MEIC requested an estimate of fees and costs, the Governor's

---

[2] Nor did the Department of Administration, who received an identical request. Department of Administration counsel responded to a January follow-up by directing MEIC to contact DEQ and the Governor's Office.

Office responded that the work would take approximately two weeks but might take longer because of other pending records requests. Later, in February, the Governor's Office advised that the information would be provided "soon." When the requested records still had not been provided by mid-March, MEIC brought suit against the Governor's Office, asserting a violation of the Public Records Act and seeking to compel production of the requested information by writ of mandamus.

¶5 The Governor's Office subsequently refused to produce any of the requested information based largely on the novel theory of a "pending litigation exception" related to the *Ksanka Elders* matter. This theory proposed an exception to general disclosure rules under the right to know when the information sought could be used to "circumvent discovery" in pending litigation. The District Court ultimately concluded that this argument was "completely unmoored from the text, history, and purpose underlying both Article II, Section 9 and the implementing public records statutes," and that a party's subjective purpose for requesting public records had no bearing on the government's duty to fulfill such requests. Thus, in the absence of any exception to disclosure, the District Court found that the Governor's Office shirked its clear legal duty to honor MEIC's request and issued a writ of mandamus compelling the Governor's Office to produce the information. The Governor's Office initially appealed on the merits of this matter but later stipulated to dismissal, and the 2023 Montana Legislature codified into law that neither pending nor potential litigation exempts public agencies from the right to know. *See* § 2-6-1003(4), MCA ("A public agency may not refuse to disclose public information

because the requested public information is part of litigation or may be part of litigation unless the information is protected from disclosure under another applicable law.").

¶6 Having succeeded on the merits of the litigation, MEIC requested attorney's fees under §§ 2-6-1009 and 2-3-221, MCA, for enforcing the right to know, and § 27-26-402, MCA, for obtaining a writ of mandamus. The District Court noted the "undeniable public interest" in MEIC's successful enforcement of its request but ultimately denied the attorney's fees motion on all bases, finding that the Governor's Office did not act out of bad faith, indolence, or unreasonable delay. The District Court noted further that much of the information MEIC sought could have been obtained through discovery in the *Ksanka Elders* litigation. MEIC appeals the denial of this motion.

## STANDARD OF REVIEW

¶7 We review a district court's decision on attorney's fees for an abuse of discretion. *Yellowstone Cnty. v. Billings Gazette*, 2006 MT 218, ¶ 14, 333 Mont. 390, 143 P.3d 135. A district court abuses its discretion if the court acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. *Friedel, LLC v. Lindeen*, 2017 MT 65, ¶ 5, 387 Mont. 102, 392 P.3d 141 (citations omitted).

## DISCUSSION

¶8 *1. Whether a party who successfully vindicates its right to know under Article II, Section 9, of the Montana Constitution is entitled to a presumption towards awarding attorney's fees.*

¶9 When a party succeeds in litigation based on a right to know request, it has performed a public service in ensuring that Montana's government is appropriately transparent and accountable to the people. Such cases serve a critical role in enforcing and

6

developing Montanans' fundamental right to know. Without this particular litigation, for example, the question of whether there is a pending litigation exception to the right to know would not have been answered, the Legislature might not have responded in affirmance, and other Montanans who have a constitutional entitlement to public documents but cannot afford the costs of litigation might have continued to be denied access on this now-refuted basis. The public service—and public benefit—accomplished by MEIC's initiation of this lawsuit is, as the District Court stated, "undeniable." Every branch of government and every member of the public has a vested interest in seeing constitutional rights defined and developed, and litigation can be a tool for doing so.

¶10 The result of the District Court's order—that MEIC prevailed and undeniably performed a public service, yet is denied attorney's fees—is dissonant with the foundational purposes of Article II, Section 9, and actively disincentivizes citizens from enforcing the right. For citizens to be able to enforce the provision against the government, litigation must be accessible; for litigation to be accessible, there should be a basic presumption towards awarding attorney's fees when the party seeking to enforce the right to know has prevailed on the merits. This Court's precedent on fees in the right to know context is such that district courts are essentially without guidance and without review, leading to results that offend the Constitution. A presumption towards awarding fees corrects these issues without impeding the discretion provided by the relevant statute.

¶11 Section 2-6-1009(4), MCA, provides, "A person alleging a deprivation of rights who prevails in an action brought in district court to enforce the person's rights under Article II, Section 9, of the Montana [C]onstitution . . . may be awarded costs and

7

reasonable attorney fees." Section §2-3-221, MCA, which pertains to the open meetings component of the right to know, provides the same. In deciding whether to award attorney's fees, a district court "may consider any factor which the parties offer or the court deems appropriate to consider." *Billings High Sch. Dist. No. 2 v. Billings Gazette*, 2006 MT 329, ¶ 32, 335 Mont. 94, 149 P.3d 565.

¶12 There is no question that the statute's language is discretionary. In *Gaustad v. City of Columbus (Matter of Investigative Records)*, 265 Mont. 379, 382, 877 P.2d 470, 472 (1994), we turned to the legislative history of § 2-3-221, MCA, when faced with the question of whether fees might be mandatory rather than permissive. Enacted in 1975—shortly after the right to know was established by the new Constitution—the statute initially provided a mandatory award of fees and costs. But the Governor "returned the bill unsigned, recommending that the legislature replace the mandatory language of the bill with language placing the award of attorney's fees within the district courts' discretion." *Matter of Investigative Records*, 265 Mont. at 382, 877 P.2d at 472 (citing H. Journal, 44th Leg., Reg. Sess. 1553 (Mont. 1975)). Both houses then approved an amendment changing "shall" to "may," which we construed to demonstrate "the clear intent of the statute [] that an award of attorney's fees is discretionary." *Matter of Investigative Records*, 265 Mont. at 382, 877 P.2d at 472 (citing H. Journal, 44th Leg., Reg. Sess. 1597 (Mont. 1975)); S. Journal, 44th Leg., Reg. Sess. 1546 (Mont. 1975). We noted that the Legislature had met several times since our initial decision that fees *may* be awarded following a successful right to know challenge in *Associated Press v. Board of Public Education*, 246 Mont. 386, 804 P.2d 376 (1991), and had made no changes to the statute, presuming that it would have

8

done so if it "disagreed with our interpretation." *Matter of Investigative Records*, 265 Mont. at 382, 877 P.2d at 472.

¶13 But against this background of a discretionary determination, this Court has left a vacuum of necessary guidance. We have provided only that a district court's decision cannot be "without rationale." *Yellowstone Cnty.*, ¶ 31. We have consistently reaffirmed the rejection of enumerated factors. *See, e.g.*, *Yellowstone Cnty.*, ¶¶ 30-31; *Unidentified Police Officers 1, 2 & 3 v. City of Billings*, 2019 MT 299, ¶ 9, 398 Mont. 226, 454 P.3d 1205; *Shockley v. Cascade Cnty.*, 2016 MT 34, ¶ 8, 382 Mont. 209, 367 P.3d 336. In essence, we have required only that a district court consider *some* factors and provide *some* reasoning.

¶14 Here, as directed by our minimal precedent, the District Court considered several factors in its denial of MEIC's fees request, including whether the Governor's Office acted in bad faith, whether the Governor's Office acted in a dilatory manner or to cause intentional delay, and whether the requested documents could have been obtained through discovery in the separate ongoing litigation between *different* parties. MEIC argues that, in effect, the District Court errantly required an affirmative showing of bad faith and delay, and was factually incorrect in holding that the same documents could have been obtained through the *Ksanka Elders* litigation. In considering all of the factors it deemed relevant, the District Court prioritized the Governor's Office's lack of bad faith and the taxpayer burden of a fees award over the value of the public service accomplished by MEIC.

¶15 A presumption towards awarding fees when a plaintiff vindicates their constitutional right to know follows naturally in the context of the right. The right is

9

fundamental and comes with a "constitutional presumption that every document within the possession of public officials is subject to inspection." *Bryan v. Yellowstone Cnty. Elem. Sch. Dist. No. 2*, 2002 MT 264, ¶ 39, 312 Mont. 257, 60 P.3d 381. When a plaintiff prevails on the merits of a right to know dispute, it means that, whether in good faith or bad faith, the government pushed back against the constitutional presumption and, in doing so, violated a fundamental right. In pursuing litigation and ultimately righting the violation, the plaintiff has "performed a service for the citizens of the State by enforcing a portion of our Constitution that would otherwise be violated." *Associated Press v. Mont. Dep't of Revenue*, 2000 MT 160, ¶ 43, 300 Mont. 233, 4 P.3d 5. But because we have previously neglected to suggest a presumption—or even a preference—for awarding fees in this context, even plaintiffs with an exceptionally strong case and an egregious violation must carefully consider whether it is worth the risk of winning the documents but losing fees.

¶16 Given the well-established discretionary nature of the statute, it is worth reiterating that a presumption is far from a mandate. The "may" language clearly contemplates a situation where plaintiffs are constitutionally entitled to the requested documents but not entitled to fees. As much as we should encourage valuable, substantive litigation, we should likewise discourage frivolous actions. Thus, even in light of the presumption, a plaintiff should not recover fees in a successful right to know action if they were unreasonable in bringing or maintaining the litigation.

¶17 In determining whether the plaintiff acted reasonably, a district court retains discretion to weigh whatever factors it desires towards the ultimate question of whether the plaintiff reasonably believed that litigation was necessary to vindicate its constitutional

10

interest.  Such factors might include, for example, the amount of time between making the request and bringing the action; communications between the parties before the action; the potential for and ease of alternative access to the materials; and the parties' conduct in the course of litigation.  Even within the context of a presumption, a district court retains its historical discretion to consider whatever factors it deems relevant and attribute each factor appropriate weight when determining whether the plaintiff acted reasonably.  And of course, a district court retains its ability to determine the precise amount of fees and costs to award; a plaintiff might be entitled to the requested documents and act reasonably in pursuing litigation, yet recover relatively little in fees and costs due to some nuance of the proceedings.

¶18     In formally recognizing this presumption, we do not meaningfully curtail a district court's discretion, nor do we seek to retroactively enact the mandatory award originally sought by the 1975 legislature or disturb the standard of review applicable to appellate review of a fees decision.  Rather, we seek to provide basic guidance that works to encourage and strengthen the people's exercise of a fundamental constitutional right.  This presumption does not eliminate judicial discretion but rather structures it to reflect the constitutional emphasis on transparency.  Courts retain ample discretion to deny fees based on the wide range of considerations going to a plaintiff's reasonableness, provided they articulate clear reasons for doing so.  This presumption is not a novelty imagined at the whims of this Court; it is part of the fabric of the right to know which has been errantly lost to an unboundedly deferential standard that allowed for results fundamentally at odds with the Constitution.  A presumption towards fees echoes the textual presumption towards

disclosure and ensures that future decisions serve to strengthen the right, not to disincentivize public engagement and enforcement.

¶19  *2. Whether an award of damages for a prevailing party in a mandamus action, including attorney's fees, is mandatory or discretionary.*

¶20  The specific remedy by which MEIC sought to enforce its right to know presents its own mechanism for fees. Section 27-26-402(1), MCA, provides that "if judgment is given for the applicant" of a writ of mandamus, "the applicant may recover the damages that the applicant has sustained . . . together with costs." We have consistently held attorney's fees to be part of damages within the meaning of the statute. *See Kadillak v. Mont. Dep't of State Lands*, 198 Mont. 70, 74, 643 P.2d 1178, 1181 (1982) (*Kadillak II*) (citing *State ex rel. O'Sullivan v. Mont. Tenth Jud. Dist. Ct.*, 127 Mont. 32, 256 P.2d 1076 (1953); *State v. Batani*, 103 Mont. 353, 62 P.2d 565 (1936)). MEIC asserts that the "may recover" language does not make a fees award discretionary, as the use of "may" would ordinarily suggest, but rather supports that district courts *must* award fees so long as the applicant requests them. Under this reasoning, the "may" language reflects the *applicant's* discretion—they may or may not move to recover fees, but if they do, the district court cannot deny them. This is distinct from "may award," which clearly grants the *courts* discretion in *providing* a remedy. The functioning of "may recover damages" in other areas of Montana law would seem to support this argument.

¶21  The Governor's Office responds, among other arguments, that the idea of a mandatory mandamus award is redundant of and in direct conflict with the clearly discretionary remedies under the Public Records Act. Indeed, that plays out here; if fees

12

were mandatory just because MEIC's remedy came in the form of a writ of mandamus, the District Court's entire consideration of whether fees are appropriate would be mooted. Every right to know enforcement action would be brought as a mandamus action, and with certain remuneration, enforcement pursuant to the Public Records Act would become a nullity. This tension requires some exploration of whether mandamus is an appropriate remedy at all in this context.

¶22 A writ of mandamus is appropriate "to compel the performance of an act that the law specifically enjoins as a duty resulting from an office, trust, or station . . . and from which the party is unlawfully precluded." Section 27-26-102(1), MCA. "The writ must be issued in all cases in which there is not a plain, speedy, and adequate remedy in the ordinary course of law." Section 27-26-102(2), MCA. Mandamus is an "'extraordinary remedy available in only rare cases.'" *Allied Waste Servs. of N. Am., LLC v. Mont. Dep't of Pub. Serv. Regul.*, 2019 MT 199, ¶ 19, 397 Mont. 85, 447 P.3d 463 (quoting *Boehm v. Park Cnty.*, 2018 MT 165, ¶ 9, 392 Mont. 72, 421 P.3d 789). "'The writ is available where the party applying for it is entitled to performance of a clear legal duty by the party against whom the writ is sought and there is no speedy and adequate remedy in the ordinary course of law.'" *Boehm*, ¶ 9 (quoting *Best v. Police Dep't of Billings*, 2000 MT 97, ¶ 14, 299 Mont. 247, 999 P.2d 334).

¶23 Because the merits appeal of the underlying writ is not before this Court, we cannot opine whether mandamus was an appropriate remedy under these circumstances. To be clear, the government has a clear legal duty to comply with the Constitution and a clear legal duty to obey the presumption that documents must be disclosed under the right to

13

know. These are undisputed. But built into the right to know, always, is the potential for countervailing privacy interests that warrant keeping documents from disclosure. These inquiries are highly fact-dependent and often present novel legal theories. Thus, by nature, the legal duty to disclose *a certain set of documents* is unlikely to be so clear as to be appropriate for issuance of a writ. However, there may be scenarios where mandamus *is* appropriate, for example, where no countervailing privacy interest is asserted or where the asserted basis for shielding documents has been previously debunked.

¶24 We also instruct district courts to pay close attention to the second part of the mandamus standard, that is, whether there is any other speedy and adequate remedy in the ordinary course of law. Mandamus should not be a front-line remedy for run-of-the-mill right to know disputes but rather should be reserved for those instances where other remedies will not accomplish the parties' needs due to specific concerns regarding timeliness or particular reticence of the governmental body to produce the requested information.

¶25 Although we conclude that a successful mandamus action will generally mandate the award of fees, we observe that attorney's fees for a successful records request made pursuant to the right to know are particularly governed by §§ 2-6-1009 and 2-3-221, MCA. A writ of mandamus remains appropriate only in clear-cut cases where no genuine countervailing interests preclude finding a clear legal duty and alternative remedies, including under the Public Records Act, are inadequate. To maintain consistency and respect legislative intent, district courts must scrutinize whether plaintiffs choose mandamus strategically rather than out of genuine necessity. As we have noted, while

there is a presumption in favor of an award of fees consistent with the "constitutional presumption that every document within the possession of public officials is subject to inspection[,]" *Bryan*, ¶ 39, it would be inappropriate to superimpose the mandatory fees of a writ onto the discretionary consideration implicated in a right to know action.

## CONCLUSION

¶26 The District Court's order is vacated and remanded to consider whether an award of attorney's fees is appropriate considering the presumption towards awarding fees and costs to plaintiffs who successfully vindicate their rights under Article II, Section 9, of the Montana Constitution.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON

Justice James Jeremiah Shea, concurring.

¶27 The sky is not falling. Contrary to the Dissents' suggestions that the Court is taking some unprecedented step off a cliff, what we are doing in this case is both well-precedented and, indeed, has long been recognized by both this Court and the United States Supreme Court as sometimes necessary.

¶28 For decades, this Court has set forth several guiding frameworks in the attorney fee context, both when fees are provided for under the common law and by statute. *See, e.g.,*

*Foy v. Anderson*, 176 Mont. 507, 511-12, 580 P.2d 114, 117 (1978) (no fault defendant fees); *Means v. Mont. Power Co.*, 191 Mont. 395, 403, 625 P.2d 32, 37 (1981) (common fund doctrine); *McCann v. Trustees, Dodson Sch. Dist.*, 249 Mont. 362, 364, 816 P.2d 435, 436-37 (1991) (Montana Human Rights Act discretionary fees provided for by statute); *Montanans for the Responsible Use of the School Tr. v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶¶ 64-67, 296 Mont. 402, 989 P.2d 800 (*Montrust*) (private attorney general theory); *Tripp v. Jeld-Wen, Inc.*, 2005 MT 121, ¶¶ 32-37, 327 Mont. 146, 112 P.3d 1018 (Montana Consumer Protection Act discretionary fees provided for by statute); *Edwards v. Cascade Cnty.*, 2009 MT 229, ¶ 22, 351 Mont. 360, 212 P.3d 289 (lodestar fee presumption); *Mlekush v. Farmers Ins. Exch.*, 2017 MT 256, ¶ 23, 389 Mont. 99, 404 P.3d 704 (*Mlekush II*) (first-party insurance exception fee presumption).

¶29 Twenty years ago this very month, this Court issued a strikingly similar Opinion dealing with the exact same issue now before us—providing guidance to the district courts in their exercise of discretion when deciding whether to award attorney fees pursuant to a statutory attorney fee provision. *Tripp*, ¶¶ 32-37.[1] In *Tripp*, the statute was § 30-14-133(3), MCA, a provision in the Montana Consumer Protection Act ("MCPA") that allowed, *but did not require*, a court to award attorney fees to a prevailing party. The text of § 30-14-133(3), MCA, is remarkably similar to the text of § 2-3-221, MCA. *Compare* § 30-14-133(3), MCA ("In any action brought under this section, the court may award the

---

[1] As in this case, *Tripp* generated a great deal of strong feelings and opinions. In addition to the majority opinion authored by Justice Leaphart, Justice Warner wrote a concurring opinion, Justice Nelson wrote a dissenting opinion, Justice Cotter wrote a concurring and dissenting opinion, and Justice Rice wrote a concurring and dissenting opinion.

prevailing party reasonable attorney fees.") *with* § 2-3-221, MCA ("A person alleging a deprivation of rights who prevails in an action brought in district court to enforce the person's rights under Article II, section 9, of the Montana constitution may be awarded costs and reasonable attorney fees."). In considering the application of this statutory provision, this Court decided in *Tripp* that a standard was necessary to guide the district courts in exercising their discretion as to when an award of attorney fees was appropriate under § 30-14-133(3), MCA. Toward that end, "[f]or guidance we look[ed] to *standards utilized in awarding attorney fees under statutes* very similar to the MCPA." *Tripp*, ¶ 34 (emphasis added). Since providing that guidance in *Tripp*, we have applied that discretion-guiding framework without dissent. *Harmon v. Fiscus Realty, Inc.*, 2011 MT 232, ¶¶ 9-12, 362 Mont. 135, 261 P.3d 1031; *Fink v. Meadow Lake Ests. Homeowners' Ass'n*, No. DA 15-0563 2016 MT 108N, ¶ 15, 2016 Mont. LEXIS 400.

¶30    In deciding *Tripp*, we noted that both this Court and the United States Supreme Court had seen the need to provide such guidance in the past, so we looked to those precedents. *Tripp*, ¶¶ 34-37. One of those precedents was this Court's decision in *McCann*, which was decided in 1991, 14 years before *Tripp*. *McCann* concerned the application of § 49-2-505(4), MCA (1979), a provision in the Montana Human Rights Act that also allowed a court, *in its discretion*, to award reasonable attorney fees to a prevailing party. The text of § 49-2-505(8), MCA,[2] is also remarkably similar to the text of § 2-3-221, MCA. *Compare* § 49-2-505(8), MCA ("The court *in its discretion* may allow the prevailing party

_____

[2] The Legislature amended § 49-2-505, MCA, after *McCann*, relocating the attorney fee provision that used to be in § 49-2-505(4), MCA, to § 49-2-505(8), MCA.

17

reasonably attorneys' fees.") *with* § 2-3-221, MCA ("A person alleging a deprivation of rights who prevails in an action brought in district court to enforce the person's rights under Article II, section 9, of the Montana constitution may be awarded costs and reasonable attorney fees."). In *McCann*, this Court found that the text of § 49-2-505(4), MCA (1979), provided insufficient guidance to district courts in exercising their discretion, so a guiding framework was necessary to "avoid discouraging the filing of meritorious claims under the Montana Human Rights Act." *McCann*, 249 Mont. at 364, 816 P.2d at 435-36. Since that decision, we have applied the discretion-guiding framework it announced without dissent. *Hanson v. Dix*, No. 03-605, 2004 MT 263N, ¶ 15, 2004 Mont. LEXIS 436; *Baxter Homeowners Ass'n v. Angel*, 2013 MT 83, ¶ 10, 369 Mont. 398, 298 P.3d 1145. It also bears noting that in the 20 years since *Tripp* was decided and the 34 years since *McCann* was decided, there have been no amendments to alter the guidance these Opinions provide to the district courts when determining whether to award attorney fees under the subject statutes.[3] *Gaustad v. City of Columbus*, 265 Mont. 379, 382, 877 P.2d 470, 472 (1994) ("We presume that if the legislature disagreed with our interpretation . . . it would have amended the statute accordingly.")

¶31 Both *Tripp* and *McCann* applied a framework that was first announced by the United States Supreme Court in *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 98 S. Ct. 694 (1978). That case concerned Section 706(k) of Title VII of the Civil Rights Act of 1964, which provides: "In any action or proceeding under this title the

---

[3] In 2021, § 30-14-133(3), MCA, was amended to include a $100,000 cap on awards permitting a grant of attorney fees, but it did not alter the discretionary fee framework provided in *Tripp*.

court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." Faced with a fees provision that provided "little more than the barest outlines" of how it was supposed to be applied, the U.S. Supreme Court determined it was necessary to provide a guiding framework to assist the federal district courts in the exercise of their discretion as to whether or not to award attorney fees. *Christiansburg*, 434 U.S. at 420, 98 S. Ct. at 700. To that end, it announced that the guiding purposes of Title VII—to vindicate "a policy that Congress considered of the highest priority" and discourage "a violator of federal law" from further violations—required two different frameworks for prevailing plaintiffs and defendants. *Christiansburg*, 434 U.S. at 418-19, 98 S. Ct. at 698. Prevailing plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust," but prevailing defendants should recover "only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." *Christiansburg*, 434 U.S. at 416-17, 421, 98 S. Ct. at 698, 700.

¶32     Justice Baker attempts to distinguish *Tripp*, *McCann*, and *Christiansburg*, by pointing out that they each involved statutes permitting the district court to award either the defendant or the plaintiff attorney fees, depending on which prevailed. The statutes at issue in this case, she argues, only permit a prevailing plaintiff to recover, militating against a presumption in favor of fees because it will make the government's job of deciding when to reject a Right to Know request more difficult. Dissent, ¶ 63. In substance, though, this is not an argument against the creation of a guiding framework so much as an argument about what that guiding framework should be. The fundamental point of *Tripp*, *McCann*, and *Christiansburg* is that both this Court and the United States Supreme Court have long

19

recognized, on a number of occasions, the necessity of creating frameworks to guide the discretion of lower courts in applying statutory awards of attorney fees in situations remarkably similar to the situation in this case.

¶33 *Tripp*, *McCann*, and *Christiansburg*, are examples dating back nearly fifty years of both this Court and the United States Supreme Court providing guidance to lower courts in the exercise of their discretion when applying statutory attorney fee provisions. The history of *Mlekush II* provides an excellent example of why such guidance is so essential.

¶34 Tanya Mlekush was injured in a car accident with an underinsured driver. *Mlekush II*, ¶ 3. Mlekush's own insurer, Farmers Insurance Exchange ("Farmers"), delayed payment under her underinsured motorist coverage. Mlekush sued. *Mlekush II*, ¶¶ 5-6. A jury found for Mlekush, awarding her an amount larger than any of Farmers' settlement offers. The district court denied Mlekush's motion for attorney fees, though, on the basis that the insurance exception to the American rule did not apply because she was not "forced to assume the burden of legal action." *Mlekush II*, ¶ 10. Mlekush appealed that determination. We held that the district court did not correctly apply the existing framework, so we remanded the matter back to the district court to apply a "totality of the circumstances analysis" to determine whether or not Mlekush was "forced to assume" the burden of legal action to obtain her insurance benefits. *Mlekush v. Farmers Ins. Exch.*, 2015 MT 302, ¶ 13, 381 Mont. 292, 358 P.3d 913 (*Mlekush I*).

¶35 On remand, the district court again ruled that Mlekush had not been forced to assume the burden of legal action and it again denied her claim for attorney fees. *Mlekush II*, ¶ 12. Mlekush appealed a second time. In *Mlekush II*, this Court recognized that the

20

guidance we provided to the district courts was inadequate; therefore, the members of this Court *unanimously* held that there is an irrebuttable presumption that "when a first-party insured is compelled to pursue litigation and a jury returns a verdict in excess of the insurer's last offer to settle an underinsured motorist claim, the insurer *must pay* the first-party insured's attorney fees in an amount subsequently determined by the district court to be reasonable." *Mlekush II*, ¶ 23 (emphasis added). As it pertains to the District Court's rationale for denying fees in this case, it is noteworthy that in *Mlekush II*, we clarified that the irrebuttable presumption in favor of attorney fees was "not a bad faith concept." *Mlekush II*, ¶ 21. Rather, "it simply recognize[d] that the insured should not bear the expense when she has to resort to litigation in order to recover the benefits for which the insured has contracted and paid premiums." *Mlekush II*, ¶ 21. We determined that such a presumption was necessary because "whenever an insurer forces its insured to assume the burden of litigation to obtain what the insured is entitled to under an insurance contract, the insured is entitled to recover attorney fees." *Mlekush II*, ¶ 18. Notably, in *Mlekush II* we divested the district courts of *any* discretion in deciding when attorney fees should be awarded in that circumstance.

¶36 The history of this case indicates that district courts are in even greater need of more concrete direction to guide their exercise of discretion in this context than they were in making the determination in the insurance exception context. Sections 2-6-1009(4) and 2-3-221, MCA were enacted in 2015 and 1975, respectively. In the time since their respective enactments, we have reviewed 32 cases on appeal under one or both of these statutes. A survey of these cases evinces a remarkable lack of guidance to the district courts

21

in how these statutes should be applied, and a corresponding lack of consistency as to when fees are awarded or denied, both in the district courts and on appeal. Indeed, in its September 18, 2023 Order in this case, the District Court lamented the lack of guidance, noting that we had "expressly declined to rely on [Justice Nelson's proposed factors] or any set list of guidelines or factors." Nor is the District Court alone in its observation that we have provided little to no guidance in how to apply these statutes. Several prior members of this Court have bemoaned our failure to set some sort of guidepost. *See Billings High Sch. Dist. No. 2 v. Billings Gazette*, 2006 MT 329, ¶¶ 40-45, 52-54, 335 Mont. 94, 149 P.3d 565 (Morris, J., joined by Warner, J., concurring) (Nelson, J., joined by Cotter, J., concurring in part and dissenting in part); *Gaustad*, 265 Mont. at 385, 877 P.2d at 474 (Trieweiler, J., dissenting).

¶37 Left adrift without any meaningful guideposts, this Court and the district courts have come to an odd variety of conclusions as to when a prevailing plaintiff is entitled to an award of attorney fees when—to borrow our language from *Mlekush II*—they have "to resort to litigation" to enforce their constitutional right to know. *Compare Associated Press, Inc. v. Mont. Dep't of Rev.*, 2000 MT 160, ¶ 43, 300 Mont. 233, 4 P.3d 5 (reversing a denial of fees where disclosure was denied pursuant to preexisting regulation and the denial was promptly made within a month of the request) *with Billings High Sch. Dist. No. 2*, ¶ 38 (affirming a denial of fees where the defendant failed to turn documents over to the district court for in camera review over a period of five months).

¶38 This case further illustrates the unpredictability that has resulted from our failure to provide any guidance. MEIC requested the documents at issue on November 29, 2021.

22

After the Governor's office did not even acknowledge the request for over a month, MEIC reached out directly to the Governor's General Counsel. The Governor's office, through its Administrative Specialist, then acknowledged the request had been made but did not indicate how quickly it would produce the records. MEIC contacted the Governor's office again on January 10, 2022, requesting a timeline for the production. The Governor's office responded on January 12, 2022, stating that the request would take approximately two weeks to complete *once staff began reviewing the documents*, but did not say when the document review would begin. More than another month passed when, on February 18, 2022, MEIC followed up for a third time requesting to know when the request would be answered. A week later, the Governor's office responded that it "anticipat[ed] completing [MEIC's] request soon," but gave no indication as to what "soon" meant. It was not until April 19, 2022—a month after MEIC was forced to file suit to recover the documents, and nearly five months after it had first made its request—that the Governor's General Counsel sent a letter to MEIC informing it that the Governor's office would not be producing any of the documents after all, and for the *first time* asserted several privileges and exceptions as its basis for denying the request in its entirety.

¶39 The District Court did its level best to apply our mishmash of precedents, selecting five factors it determined relevant to consider, and determined that they weighed slightly against awarding attorney fees. But in doing so, the District Court applied its own presumption *in favor of the State* as to at least one of those factors. The District Court determined that the State did not "act in a particularly dilatory fashion," but in doing so it specifically noted its difficulty in making that determination because "[t]he record does not

23

contain enough information about the length of time needed to fulfill similar requests or the workload and capacity of the Governor's office to assess whether this was a 'timely' response." Based on that lack of evidence, the District Court concluded: "On its face . . . the foregoing does not indicate indolence or intentional delay." Obviously, the Governor's office is the party that is best positioned to provide information about the length of time it has needed to fulfill similar requests or its own workload and capacity. But why would it ever produce that information for the District Court's consideration if it will benefit from a *presumption* that the absence of such information will lead to the conclusion that it did *not* act with indolence or intentional delay. On the other hand, another District Court, in its discretion, might very well presume that the Governor's office did act with indolence or intentional delay precisely *because* it failed to provide evidence to the contrary—evidence that was exclusively within its control. The fact that two district courts could apply competing presumptions based on the same conduct that may likely lead to diametrically opposed results illustrates the need for more concrete guidance from this Court. One of the fundamental aspects of the rebuttable presumption imposed by this Opinion is the commonsense requirement that the State should explain the manner in which it responded—or failed to respond—to a right to know request, instead of allowing it to benefit from its failure to provide an explanation.

¶40 So the District Court concluded that the timeline of this case demonstrated that the State did not act in a particularly dilatory fashion—a conclusion driven by the District Court's presumption that the State acted timely because "[t]he record does not contain enough information about the length of time needed to fulfill similar requests or the

24

workload and capacity of the Governor's office." But how does this timeline hold up without that presumption in favor of the State? We often hear people say that government should operate more like a business. So let's use that analogy.

¶41 John Q. Citizen places an order with Montana Corp. Mr. Citizen waits patiently for *over a month* without so much as an email even acknowledging his order, so he contacts Montana Corp. to confirm that Montana Corp. even got the order. Montana Corp. responds with "yeah we got your order," but gives no indication as to when Mr. Citizen can expect the order to be filled. So Mr. Citizen inquires *again* asking when he can expect his order will be filled. Montana Corp. responds with "It'll be about two weeks after we start to work on it." At this point, most of us would say, "Wait, what? You haven't even started to work on my order? It's been almost six weeks. You know what? Just give me my money back." But, of course, this is a non-refundable order, and Mr. Citizen has the patience of Job, so he waits for more than *another month* before he contacts Montana Corp., asking again where his order is. Another week goes by before Montana Corp. even responds to this inquiry, and when it does its response is a vague noncommittal "we anticipate filling your order soon," but Montana Corp. doesn't say what "soon" means. At this point, Mr. Citizen starts to get worried that he's just being strung along so he's forced to hire an attorney to sue Montana Corp. to fill the order he placed over three-and-a-half months earlier. Then another month goes by before Montana Corp. even responds to the lawsuit and, when it does respond over *five-and-a-half months* after Mr. Citizen placed his order, Montana Corp. tells Mr. Citizen for the *first time*:

25

Dear Mr. Citizen:

Thank you for your patience these past five-and-a-half months.  Despite our previous assurances to you that we would be filling your order "soon," we've now decided we're not going to fill your order at all.

Thank you for being a loyal customer of Montana Corp.

Sincerely,

Montana Corp. Customer Service

So then Mr. Citizen is required to incur the expense and delay of going through the courts for another year and three months until Montana Corp. is forced to fill his order by court order.

¶42    Considering that level of customer service, anyone would be hard-pressed to ever order anything from Montana Corp. ever again just based on the *unexplained* delays and unresponsiveness prior to the litigation commencing.  While not a standard that I am advocating for the District Courts in the future, when deciding whether a citizen should have to bear the expense of going to court to vindicate their constitutional right to know, I think the citizens of Montana are entitled to expect more from their government than service that would earn a one-star Yelp review.  But if a District Court is inclined to give the State a pass based on these facts, shouldn't the State at least be required to explain the reasons for its delays and failures to respond?  And in the complete absence of any explanation, what is the basis for giving *the State* the benefit of a presumption that it did *not* act with indolence or intentional delay?

¶43    The Governor's assertion that MEIC was attempting to use its constitutional right to know to circumvent discovery—while ultimately not a valid defense—provides yet

another apt analogy. In a civil case, litigants generally have 30 days to respond to a request to produce documents. *See* M. R. Civ. P. 34(b)(2)(A). "We have repeatedly articulated a low-tolerance approach toward discovery abuse, encouraging district courts not to give transgressors second chances but rather to impose sanctions." *Peterman v. Herbalife Int'l, Inc.*, 2010 MT 142, ¶ 17, 356 Mont. 542, 234 P.3d 898.[4] In this case, the District Court closed its order denying MEIC's fee request by noting that in "the absence of precedent, the Court [did] not find this to be a case where the taxpayers should bear the burden of the Court's order." While I sympathize wholeheartedly with the District Court's point about a lack of guiding precedent, the District Court's point failed to account for the fact that the taxpayers had already incurred the cost of attorney fees for private counsel hired by the Governor's office to defend withholding the documents. Obviously, the Governor, in his discretion, has the right to hire competent outside legal counsel to defend his office in a right to know claim. But if a district court, in its discretion, is going to consider the expenditure of taxpayer dollars as a factor in deciding whether or not to award attorney fees, it seems ironic that this consideration should be weighed against the taxpaying citizens who successfully litigated their constitutional right to know.

¶44 In the final analysis, all the Court's Opinion in this case does is finally provide the guidance that district courts and multiple Justices have been asking us to provide for at

---

[4] This provides yet another example where we have imposed a framework to guide district courts in their exercise of a core discretionary function. Surely if creating a presumption in favor of awarding sanctions—that routinely will include an award of attorney fees and costs—for failing to produce documents during discovery did not rob district courts of their discretion, then creating a presumption in favor of awarding attorney fees for failing to produce documents under a constitutional mandate will not do so.

least 30 years, in a manner that has been employed by both this Court and the United States Supreme Court for nearly 50 years. In doing so, it recognizes that when a Montana citizen has to resort to litigation in order to vindicate a constitutional right, the citizen is entitled to a *rebuttable* presumption that he should not bear the expense of that litigation. *See Mlekush II*, ¶ 21. Toward that end, we are simply holding that whenever the State forces its citizens to assume the burden of litigation to obtain what the citizens are entitled to under the Montana Constitution, the citizens are entitled to a presumption in favor of attorney fees. *See Mlekush II*, ¶ 18. This framework does not divest district courts of their discretion in determining whether the State has overcome that rebuttable presumption, it merely provides what we have provided in dozens of contexts: a guiding principle for them to apply in exercising that discretion.

¶45 Justice Rice's Dissent goes well beyond Justice Baker's concerns regarding the trial court's discretion. He accuses the Court of perpetuating a "recent trend of holdings wherein the Court has resolved cases after setting aside longstanding governing principles of the law" and "backfill[ing] arbitrarily, including potentially the justice's personal preferences, desires, agendas, and even biases." Dissent, ¶ 68. Justice Rice's serious accusations provide me with an opportunity to remind the reading public of how this Court reaches its decisions. Members of this Court swear to "support, protect and defend the constitution of the United States, and the constitution of the state of Montana, and . . . discharge the duties of [his or her] office with fidelity" an oath that I, and I know *all* of my fellow Justices, take gravely seriously. Mont. Const. art. III, § 3. When cases are filed with the Court, we consider them in conference and take a vote on the outcome

based on our reasoned understanding of the law. A single Justice is assigned to write an opinion expressing the vote of the majority of the Court, but their opinion is ultimately signed by *all* of the justices who voted in favor of the outcome. Thus, each of our opinions is the result of a serious discussion among duly elected colleagues to reach what a majority of the Court considers the correct conclusion. Of course, there will be disagreements. That's why there's an odd number of members on the Court.

¶46 To support his assertion that a majority of this Court has jumped those procedural guardrails and begun deciding cases based on "the [J]ustice's personal preferences, desires, agendas, and even biases" Justice Rice cites three cases: *Svenstad v. Newman Ayers Ranch, Inc.*, 2024 MT 246, 418 Mont. 378, 557 P.3d 1240; *State v. Wolfblack*, 2024 MT 166, 417 Mont. 376, 553 P.3d 9; and *State v. Gibbons*, 2024 MT 63, 416 Mont. 1, 545 P.3d 686. Dissent, ¶¶ 69, 74, 76. Justice Rice asserts that these cases signal a departure from typical statutory construction as evidenced by the Legislature's recent actions to overturn those decisions by amending the statutes they interpreted.[5] I assert that the Legislature's actions signal that the system is working as the Framers of our Constitution intended. It is axiomatic that it is the job of the Legislature to write the laws and the job of the Courts is to interpret them. We do our best to fulfill our half of that constitutional bargain, but sometimes the Legislature feels we have done our job incorrectly. Their constitutional

---

[5] As I discuss in more detail below, the Legislature recently passed a bill to overrule our holding in *O'Neill v. Gianforte*, 2025 MT 2, 420 Mont. 125, 561 P.3d 1018. The Governor prevailed in *O'Neill*, an Opinion which I authored and in which Justice Rice concurred. *O'Neill* is but one of many examples proving the point that the Legislature may see fit to pass legislation responding to our decisions, regardless of any perceived biases of the Opinion or its signing Justices, or the political affiliation of the prevailing party.

response is to go back to the drawing board and rewrite the laws so that we read them the way they think we should. This conversation between us and the legislature has been going on since Montana became a State and will go on long after the Justices currently on the Court have left. *See Bonner v. Minnier*, 13 Mont. 269, 273, 34 P. 30, 30 (1893).

¶47 But Justice Rice does not stop at accusing us, his colleagues, of inserting our personal biases into the law. Citing what he sees as a biased distinction between decisions in cases involving Democratic and Republican administrations, he goes on to ask the question "what are the Republican Defendant and Republicans in general—and anyone concerned about impartiality—supposed to make of the Court's decision today?" Dissent, ¶ 79. Such a weighty question deserves a fulsome answer. My frontline answer is "the same thing the Democratic defendant was supposed to think in 2005 when this Court decided *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, 326 Mont. 304, 109 P.3d 257 (*C Falls*)." At that time, the Governor, Attorney General, and Legislature all comprised a Democratic administration. We decided that the administration's decisions regarding school funding violated Article X, Section 1(3), of the Montana Constitution. *C Falls*, ¶ 31. We also reversed the district court's denial of attorney fees to the plaintiffs and remanded to the district court to consider whether to award attorney fees under our then recent private attorney general doctrine. *C Falls*, ¶ 41 (citing *Montrust*, ¶ 67). Sound familiar? Justice Rice concurred in that decision, evidently not concerned with what the Democratic defendant was to make of it. Perhaps because the defendant was to make of it what every losing party before is to make of our decisions: that a majority of this Court decided they were wrong, nothing more.

30

¶48 Justice Rice's concerns extend beyond this case. He is worried about "another coincidental Republican defeat in a run of bad case outcomes." Dissent, ¶ 79. Presumably he means the few cases he cited earlier in his Dissent, all from 2024. For greater context, I took a broader look at the current administration's "losing streak." Since the Governor took office in 2021, we have issued three published opinions in cases in which the Governor was the named defendant: *Brown v. Gianforte*, 2021 MT 149, 404 Mont. 269, 488 P.3d 548; *O'Neill v. Gianforte*, 2025 MT 2, 420 Mont. 125, 561 P.3d 1018; *Choteau Acantha Publ'g, Inc. v. Gianforte*, 2025 MT 76, 421 Mont. 345, ___ P.3d ___. The Governor prevailed in two of those three cases. To provide some background relevant to this discussion, I authored the two opinions in which the Governor prevailed; Justice Rice authored the opinion in which the Governor lost. Speaking for myself, I can attest that in neither of the two cases I authored, was I looking for a way to give the Governor a win; nor do I think my colleagues who joined my Opinion had any such motivation. I also feel confident in stating that Justice Rice wasn't looking to put one in the Governor's "L Column" with *Choteau Acantha Publ'g*. Neither *Brown* nor *O'Neill* was a "pro-Republican" Opinion any more than *Choteau Acantha Publ'g* was an "anti-Republican" Opinion. All three Opinions, and their dissenting Opinions, were guided by the same North Star—the individual Justices' sincere desire to adhere to and uphold our Constitution.

¶49 Nor does the fact that some members of this Court reached different conclusions in both *Brown* and *O'Neill* suggest any partisan motivation on their part. No case illustrates this point better than *O'Neill*. In *O'Neill*, Justice McKinnon authored a strongly worded

31

dissenting Opinion, in which she was joined by Justice Gustafson and Judge Halligan.[6]

After *O'Neill* was issued, the Legislature introduced, and recently passed, HB 271, in direct response to this Court's holding in *O'Neill*. The preamble of the Bill explicitly states that it was necessary because "the Montana Supreme Court recently issued a decision in *O'Neill v. Gianforte*, 2025 MT 2." The Legislature debated the bill, and a majority *bipartisan* coalition of legislators in both houses effectively adopted Justice McKinnon's position as expressed in her dissenting Opinion.

¶50    More broadly, in the same period since the Governor took office, this Court has issued approximately 45 published opinions in which the State was the named defendant. The State prevailed in 32 of those opinions, giving the State a win rate of approximately 71%. How often the State prevails in cases where it is the plaintiff is a subject for a future law review article, but my personal experience suggests that the State's win rate is even higher in those instances. If a two-thirds-plus win rate constitutes a "run of bad case outcomes," I do not dare consider what many of the parties that practice before us must think of their win rates or the ostensible "personal preferences, desires, agendas, and even biases" they ascribe to us.

¶51    In *Tripp*, Justice Rice wrote a strongly-worded dissent very similar to his dissent in this case. As in this case, he said the Court was overstepping its bounds, but unlike this

---

[6] District Court Judge Halligan, sitting for former Chief Justice Mike McGrath.

case he did not suggest a partisan motivation for the Court's Opinion. Justice John Warner,[7] one of the concurring Justices in *Tripp*, responded to Justice Rice's dissent:

> I agree with the principles in Justice Rice's dissent on [the attorney fee issue]. I would sign that dissent if I was of the opinion that such principles applied. However, as provided in § 30–14–133(3), MCA, and noted by the Court at ¶ 32, the legislature has made an award of attorney fees to either a prevailing plaintiff or defendant discretionary, not mandatory. *We here set a standard for the exercise of that discretion. We show no disrespect to, nor do we infringe on, the legislature's prerogative by setting such standard.*

(Emphasis added.) But for the citation to the specific statute at issue, Justice Warner's eloquent—and much briefer—concurrence could be written nearly verbatim in this case:

> [A]s provided in [§ 2-3-221], MCA, . . . the legislature has made an award of attorney fees . . . discretionary, not mandatory. We here set a standard for the exercise of that discretion. We show no disrespect to, nor do we infringe on, the legislature's prerogative by setting such standard.

As noted above, the lack of any action by the Legislature over the past twenty years since *Tripp* was decided certainly indicates that the Legislature did not view this Court's Opinion in *Tripp* as disrespectful or infringing on its prerogative. Nor should this Opinion be viewed as such.

¶52 There is nothing new about the Court's Opinion providing a framework to guide the district court's discretion in the application of a statutory award of attorney fees. We did it in *Tripp*, we did it in *McCann*, and the United States Supreme Court did it in

---

[7] Just as I do not ascribe any partisan bias to the current members of the Court participating in this Opinion, I likewise do not ascribe any partisan bias to the members of this Court who participated in deciding *Tripp*. But since we're looking at this matter through a partisan lens, I suppose it should be noted that both Justice Warner and Justice Rice were appointed to the Supreme Court by Governor Judy Martz.

*Christiansburg* nearly fifty years ago. There is nothing new about the reasoning behind the Court's opinion. It is meaningfully identical to the reasoning this Court unanimously applied in *Mlekush II*, except in *Mlekush II* we imposed an *irrebuttable* presumption for an award of attorney fees whereas, in deference to the statutory language, the guidance provided here is a rebuttable presumption. There is nothing new about Justice Rice's concerns with providing a guiding framework in these circumstances. He expressed similar concerns in his dissent in *Tripp*. There is nothing new about my response to Justice Rice's concerns, which Justice Warner expressed much more concisely in his concurrence in *Tripp*. The only thing new in this case are the accusations that the Court's holding is not only new, but motivated by personal biases and partisan preferences. Those accusations are demonstrably false and dangerously novel.

¶53 Dissents and concurrences are a time-honored tradition of judicial practice. They are an essential tool in highlighting alternative arguments, suggesting future solutions to outstanding issues, and clarifying a Justice's position. Rare are the dissents, however, that close by suggesting that the public should read the Court's decision as motivation to alter the method by which the Court is elected. Justice Rice asks why such proposals "continue to arise year after year" and closes with a quote from Pogo suggesting that he has "met the enemy, and he is us." Dissent, ¶ 80. "With all due respect," is a phrase that is too often casually bandied about when what follows is usually a statement that exhibits very little respect. So I feel it necessary to preface my answer to Justice Rice's concluding question by stating that I have nothing but sincere, tremendous respect for Justice Rice, as I do all my colleagues on the Court—respect that endures even when we disagree. But with all

34

due respect to Justice Rice and Pogo, I think the answer to Justice Rice's final question is, in this instance, more aptly answered by the classic line from 1979's *When a Stranger Calls*: "The call is coming from inside the house."

/S/ JAMES JEREMIAH SHEA

Justices Katherine M. Bidegaray and Ingrid Gustafson join in the concurring Opinion of Justice James Jeremiah Shea.

/S/ KATHERINE M BIDEGARAY
/S/ INGRID GUSTAFSON

Justice Beth Baker, dissenting.

¶54 For fifty years, beginning soon after the Montana Constitution was adopted, Montana statutes have allowed a court to award attorney fees to the prevailing party in an action brought under Article II, Section 9 of the Montana Constitution. Sections 2-3-221, 2-6-1009(4), MCA. We have left to the discretion of the district court whether to grant such an award. *Shockley*, ¶¶ 7-8. We have declined to set firm guidelines for district court consideration in awarding fees to prevailing plaintiffs in right to know actions, instead requiring only that the court explain its rationale for an award or denial. *Unidentified Police Officers 1, 2, & 3*, ¶ 9; *Shockley*, ¶ 8; *Yellowstone Cnty.*, ¶¶ 30-31.

¶55 Under our guiding standards, when reviewing a decision on attorney fees under § 2-3-221, MCA—similar to other discretionary fee awards—we apply a deferential standard of review. "We will not substitute our judgment for that of a district court unless that court clearly abused its discretion." *Unidentified Police Officers 1, 2, & 3*, ¶ 7

35

(citations and internal quotation marks omitted). A district court abuses its discretion if the court acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. *Friedel, LLC*, ¶ 5 (citation omitted).

¶56 Here, when the District Court declined to award fees, it reasoned that the Governor did not act in bad faith or with undue delay and that a discovery request could have been utilized in obtaining the requested documents regardless. The District Court did not act summarily in denying MEIC's motion for attorney fees or fail to explain its rationale. The court's six-page order detailed the circumstances in this case and balanced the benefit gained from litigating the public's right to know against the actions taken by the Governor's Office. The court acknowledged that the public did benefit from MEIC's efforts in obtaining the records and that liability for fees potentially could deter public entities from noncompliance with their constitutional obligations. But it found that the Governor's Office did not act in bad faith in relying on the "underlying litigation" exception, as past administrations had relied on the same "alleged privilege," and that the Governor's Office was not dilatory in the time it took to address the request given the breadth of the request and its timing during the holiday season. The court also observed, citing in part our decision in *Friedel, LLC*, ¶¶ 8–9, that "the scope of discovery is sufficiently broad that much—if not all—of the information MEIC sought could have been obtained in [the *Ksanka Elders* litigation]." With these factors in mind, the District Court ultimately determined that an award of attorney fees was not warranted in this case.

¶57 MEIC suggests that the District Court imposed a "standard" requiring proof of bad faith to secure an award of fees. But as in other decisions relating to the award of attorney

36

fees in a right to know action, the District Court did not mandate a set of criteria that must be met before attorney fees may be awarded. Instead, it considered the relevant factors of the case, weighed the parties' arguments, and articulated a reasoned decision based on the totality of the circumstances.

¶58 We have emphasized that, "under the abuse of discretion standard of review, district courts may reach different determinations of substantially similar questions, as long as neither court has 'acted arbitrarily without conscientious judgment or exceeded the bounds of reason.'" *Rolan v. New West Health Servs.*, 2013 MT 220, ¶ 24, 371 Mont. 228, 307 P.3d 291 (citation omitted). We do not determine whether we would have reached the same decision. *Rolan*, ¶ 24 (citation omitted). A trial court may give substantial weight to any factors it determines have the most effect on the subject matter of each case in deciding if an award of fees is proper. *Compare Friedel, LLC*, ¶¶ 4, 8 (denial of attorney fees under § 2-3-221, MCA, upheld where the district court determined that the plaintiff took an unreasonable approach to resolve dispute at hand), *and Billings High Sch. Dist. No. 2*, ¶¶ 37-38 (denial of attorney fees under § 2-3-221, MCA, upheld where the district court determined that the public entity was reasonable by seeking judicial determination prior to the release of certain documents due to potential privacy concerns), *with Unidentified Police Officers 1, 2, & 3*, ¶¶ 13-14 (upholding award of fees based on the public benefit gained from disclosure despite good faith efforts by the public entity to balance privacy interests and exposure to litigation against the right to know). Here, the District Court provided its own rationale for its denial of fees, focusing on the factors it deemed most appropriate based on the circumstances of the case.

37

¶59 Montana follows the American Rule for attorney fees, which requires each party in a case to pay its own attorney fees, "absent statutory or contractual authority to the contrary." *Abbey/Land, LLC v. Glacier Constr. Partners, LLC*, 2019 MT 19, ¶ 63, 394 Mont. 135, 433 P.3d 1230 (quoting *Goodover v. Lindey's*, 255 Mont. 430, 445, 843 P.2d 765, 774 (1992)). We construe exceptions to the American Rule narrowly. *See Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 22, 351 Mont. 464, 215 P.3d 649; *Cmty. Ass'n for N. Shore Conservation, Inc. v. Flathead Cnty.*, 2019 MT 147, ¶ 47, 396 Mont. 194, 445 P.3d 1195; *Abbey/Land, LLC*, ¶ 64. Applicable here, there is statutory authority for fees, but it is permissive and does not indicate a presumption of fees to the prevailing plaintiff as the Court now holds. Opinion, ¶ 10. The award of fees instead long has been committed to the discretion of the trial court, and we review a court's grant or denial just as we review any other discretionary determination. *See* § 1-2-101, MCA.

¶60 Reasoning that a plaintiff's success in vindicating the right to know means the government has "pushed back against the constitutional presumption and [therefore] violated a fundamental right," the Court concludes that a presumption for awarding fees "follows naturally." Opinion, ¶ 15. This rationale is overly simplistic. It fails to appreciate the wide range of public requests between those that are "frivolous" or "unreasonable" and those that present an "exceptionally strong case and an egregious violation" of the right to know. Opinion, ¶¶ 15-16. For example, under state law, the dissemination of confidential criminal justice information is restricted "to criminal justice agencies, to those authorized by law to receive it, and to those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public

38

disclosure[.]" Section 44-5-303, MCA. We considered this provision in *Bozeman Daily Chron. v. City of Bozeman Police Dep't*, 260 Mont. 218, 859 P.2d 435 (1993). Noting that "[t]he public's right to know and the individual's right to privacy inevitably conflict in cases involving a request for confidential criminal justice information[,]" we held that "it is incumbent upon a party to make a proper showing in order to be eligible to receive such specific confidential information." *Bozeman Daily Chron.*, 260 Mont. at 224, 859 P.2d at 439 (quoting *Allstate Ins. Co. v. City of Billings*, 239 Mont. 321, 326, 780 P.2d 186, 189 (1989)). Once a party has met that initial burden, "it then becomes incumbent upon the agency or person in possession of the information to demonstrate why all or portions thereof should not be released because the rights of individual privacy outweigh the merits of public disclosure." *Bozeman Daily Chron.*, 260 Mont. at 227, 859 P.2d at 441. We recognized, in that case and in many others since, that the district courts must "balance the competing right to know and right to privacy to determine what, if any, information should be given to the party requesting the information from the government." *Bozeman Daily Chron.*, 260 Mont. at 227, 859 P.2d at 441 (citation omitted). *See also, e.g.*, *Nelson v. City of Billings*, 2018 MT 36, ¶ 36, 390 Mont. 290, 412 P.3d 1058 (holding that government entity asserting protections of attorney-client or work-product privilege in a request for public documents must prove application and scope of the asserted privilege to a reviewing court, which then "must—as possible based on the nature and substance of the documents—give effect to both the subject privilege and the public's right to know by ordering appropriate redaction of the privileged information and disclosure of the unprivileged balance of the document, if any"); *Krakauer v. State,* 2016 MT 230, ¶ 39, 384

39

Mont. 527, 381 P.3d 524 (reiterating "the efficacy of an *in camera* review of requested records by a district court to ensure that privacy interests are protected") (citations omitted); *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 17, 333 Mont. 331, 142 P.3d 864 (agreeing that "determining which criminal justice information may be disseminated to the public requires a factually specific inquiry" to be conducted by the district court); *Jefferson Cnty. v. Mont. Standard*, 2003 MT 304, ¶ 19, 318 Mont. 173, 79 P.3d 805 (noting that "it is proper for a district court to conduct . . . an *in camera* inspection in order to balance the privacy rights of all of the individuals involved in the case against the public's right to know") (citations omitted).

¶61    In similar regard, this Court recently held that the Governor enjoys a limited privilege under Montana's Constitution, essential to carrying out the Governor's constitutional duties, to shield from public disclosure information received during pre-decisional deliberations to the extent disclosure would chill future candor. *O'Neill v. Gianforte*, 2025 MT 2, ¶ 26, 420 Mont. 125, 561 P.3d 1018. We determined that recognition of such a gubernatorial privilege was "necessary for the integrity of government." *O'Neill*, ¶ 24 (quotation omitted). But we cautioned that the Governor had to meet a "high bar of demonstrating that the information is essential to carrying out a constitutional duty and that its disclosure would chill future candor"—a showing that must be made to a reviewing court, which would be tasked to examine and appropriately redact the requested documents to give effect both to the necessary privilege and to the public's right to know. *O'Neill*, ¶¶ 26-27.

¶62 These cases demonstrate that vindication of the public's right to know is only part of the equation when a district court considers a prevailing plaintiff's fee request. The government's "push[-]back" against a demand for public documents does not *ipso facto* mean the government has violated a fundamental right. Opinion, ¶ 15. The government must meet its obligation to make information available to the public *and* its obligation to protect individual privacy interests or other recognized privileges. It should not be discouraged from studied consideration of the competing interests, or from submitting such conflicts to the district courts for the required balancing, by a presumption that failure to produce the information on demand will make the government liable for the requesting party's attorney fees.

¶63 This difference also is what distinguishes right-to-know fee litigation from the cases cited in Justice Shea's concurrence. First, *Mlekush II*, ¶¶ 15-16, involved the common law "insurance exception" to the American Rule, recognizing that an insurer is liable for attorney fees when the insurer breaches its contractual duty to defend and indemnify its insured. "Thus, when a first-party insured buys insurance, . . . he or she does so with the reasonable expectation that they will be treated fairly and will not have to resort to expensive, time-consuming litigation in order to recover what they are rightfully entitled to under the terms of their insurance policy." *Mlekush II*, ¶ 20. Second, *McCann*, *Tripp*, and the *Christiansburg* case they cited all involved how to determine when a prevailing defendant should be awarded fees under a "prevailing party" statute. *See McCann*, 249 Mont. at 364, 816 P.2d at 436-37; *Tripp*, ¶ 37; *Christiansburg,* 434 U.S. at 422, 98 S. Ct. at 701. In a right-to-know case, the government is not eligible to recover fees. *See*

§§ 2-3-221, MCA (authorizing fees to a successful plaintiff "alleging a deprivation of rights under Article II, section 9, of the Montana constitution"), 2-6-1009(4), MCA (authorizing fees to a successful plaintiff "alleging a deprivation of rights under Article II, section 9, of the Montana constitution or under" the public records statutes). Distinct from each of those situations is the government's obligation to balance competing rights and interests when evaluating a public information request. In my view, that is why a presumption in favor of fees is not appropriate.

¶64 The Court's new presumption will not relieve the trial courts' burden to examine the circumstances of each case, as they now will need to determine when or under what circumstances such a presumption is overcome. It again will be up to this Court to review on appeal whether a district court abused its discretion in deciding that the presumption either did or did not apply under the circumstances of the particular case. In my view, there is no reason to depart from our customary review of attorney fee rulings for abuse of discretion. Rather than being "unboundedly deferential," Opinion, ¶ 18, it is a standard that is well-defined in our jurisprudence, has articulable parameters, and is applied to innumerable discretionary rulings.

¶65 Finally, regarding MEIC's contention that it is entitled to fees under § 27-26-402(1), MCA, because it prevailed on its mandamus claim, we explained in *Bd. of Trustees v. Bd. of Cnty. Comm'rs*, 186 Mont. 148, 158-59, 606 P.2d 1069, 1075 (1980), that the appropriate method of bringing an action asserting a violation of open meeting laws is by petition pursuant to § 2-3-203, MCA, not for a writ of mandamus. We reiterated in *Goyen v. City of Troy*, 276 Mont. 213, 223, 915 P.2d 824, 831 (1996), "that actions for violations

42

of the open meeting law are appropriately brought by a petition alleging violation of the act pursuant to § 2-3-203, MCA. Writs of mandamus and prohibition are not appropriate for the enforcement of those provisions." As the Court reasons, attorney fees likewise are specifically provided for in § 2-3-221, MCA, which is the appropriate method for recovering fees in such actions, rendering the provision for fees under the mandamus statutes "unimportant." *Bd. of Trustees*, 186 Mont. at 159, 606 P.2d at 1075. I would conclude simply that fee requests in an action asserting violation of Montana's public records laws are appropriately brought via petition pursuant to § 2-6-1009, MCA, which—like § 2-3-221, MCA—provides for a discretionary award of attorney fees to a prevailing party. Therefore, the District Court did not err in declining to award fees under the mandamus statutes.

¶66 I dissent from the Court's decision to establish a presumption in favor of fee awards in right-to-know actions. The District Court's reasoned consideration of MEIC's fee request reveals that it used conscientious judgment in making its decision. Because the court acted within its discretion when it denied attorney fees and MEIC has not demonstrated that its denial was arbitrary, outside the bounds of reason, or failed to employ conscientious judgment, I would affirm.

/S/ BETH BAKER

Chief Justice Cory J. Swanson and Justice Jim Rice join in the dissenting Opinion of Justice Beth Baker.

/S/ CORY J. SWANSON
/S/ JIM RICE

43

Justice Jim Rice, dissenting.

¶67 Justice Baker's Dissent skillfully applies the extensive existing law governing the matter before the Court, including the statute, the standards for statutory interpretation, and our longstanding consistent precedent, is a classically proper legal analysis, and reaches the correct legal conclusion. It should be the Court's opinion.

¶68 The contrast between the Dissent and the Majority Opinion is not only obvious, but to a careful observer, should be shocking. The Majority Opinion is essentially based upon no governing law at all. The imposition of a new presumption has not been requested, briefed, or analyzed during the course of the litigation. More concerning, it perpetuates a recent trend of holdings wherein the Court has resolved cases after setting aside longstanding governing principles of the law. When established principles are discarded, a legal vacuum is left that must necessarily be backfilled arbitrarily, including potentially the justices' personal preferences, desires, agendas, and even biases, whether knowingly or not. While I do not question the sincerity and good intentions of the justices who have decided these recent cases, sincerity alone will not prevent a slide into a pattern of analytical error. The interests of litigants who rightly expect the Court to follow established law and feel unfairly treated if the Court fails to do so, are too important for this concern to be ignored.

¶69 In *Stensvad v. Newman Ayers Ranch, Inc.*, 2024 MT 246, 418 Mont. 378, 557 P.3d 1240, the Court addressed a 2023 statute providing new standards for issuance of preliminary injunctions. The statute explicitly provided that the Legislature's intent was that the new standards "mirror the federal preliminary injunction standard, and that

interpretation and application of [the statute] closely follow United States supreme court case law." Section 27-19-201(4), MCA (2023). The plain wording of this provision left no room for any doubt about the Legislature's intent. Indeed, the Court was not even faced with the task of determining legislative intent—it was absolutely clear: to "closely follow" U.S. Supreme Court precedent, based upon the factors adopted by that Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008) (the "*Winter* factors"). Consistent therewith, the new statute's language was an exact re-statement of the factors stated by the U.S. Supreme Court in *Winter*. *Compare Winter*, 555 U.S. 7, 20, 129 S. Ct. 365, 366 (2008), *and* § 27-19-201(1), MCA (2023).

¶70 However, despite the unmistakable clarity of the Legislature's intent, the Court did not follow it. First, it waved off the statute's plain wording, declaring that "the Legislature's instruction to mirror Supreme Court case law is not as simple as merely applying the *Winter* factors." *Stensvad*, ¶ 12. *But cf. Mont. Indep. Living Project v. City of Helena*, 2021 MT 14, ¶ 11, 403 Mont. 81, 479 P.3d 961 ("Language that is clear and unambiguous, using words' plain and ordinary meanings, requires no further interpretation."). Indeed, the Court seemingly dismissed the Legislature's capability to even understand and legislate on the issue, which, of course, would be constitutionally indefensible. Setting aside these governing principles left a vacuum that the Court arbitrarily filled with its own creation, imposing standards that directly contradicted the statute and the Legislature's expressed intent. The Court held that eligibility for injunctions would be governed by sliding scales and sundry tests and factors employed by, not the U.S. Supreme Court, but the Ninth Circuit Court of Appeals. *Stensvad*, ¶ 25.

¶71 The Court was alerted to its error by the separate opinion:

> The Legislature uniquely provided in plain language the source of any further clarification of the new statute that may be necessary. . . . [C]ourts are to look to and "closely follow" U.S. Supreme Court case law to guide the "interpretation and application" of the new four-part, conjunctive standard, and I would do so in adherence to this express statutory directive. The Court instead holds that the new statute should be interpreted under the case law of the Ninth Circuit Court of Appeals.

> .   .   .

> *[T]he [U.S.] Supreme Court does not apply sliding scales or impose additional tests upon factors or require additional inquiries or employ approaches that may be used by the federal circuits or other courts. I thus respectfully disagree with the Court that "the Legislature's instruction to mirror Supreme Court case law is not as simple as merely applying the Winter factors."* . . . The clarity of the U.S. Supreme Court's *Winter* jurisprudence is likely the reason the Legislature endorsed that particular body of precedent and expressly required that it be "closely follow[ed]." I believe this plain and specific directive does not leave room for application of alternate interpretive factors or tests formulated by other courts.

*Stensvad*, ¶¶ 41, 45 (Rice, J., disagreeing with the Court's reasoning but concurring in the result under application of the *Winter* standards) (emphasis added). However, the Court did not relent.

¶72 Faced with a judicial holding that was directly contradictory to its intent, the Legislature acted immediately to restore the statute. House Bill 409, introduced in the 2025 legislative session, provided, first, an explanation of the Court's rejection of the Legislature's expressed intent:

> WHEREAS, in 2023, the Montana Legislature amended section 27-19-201, MCA, to establish a standard for preliminary injunctions and temporary restraining orders *based on United States Supreme Court precedent*; and

> WHEREAS, that section states, "It is the intent of the legislature that the language in subsection (1) mirror the federal preliminary injunction standard,

46

and that interpretation and application of subsection (1) closely follow United States supreme court case law"; and

WHEREAS, in Stensvad v. Newma[n] Ayers Ranch, Inc., the Montana Supreme Court adopted the serious questions test, a sliding scale approach to evaluating applications for preliminary injunctions and temporary restraining orders; and

WHEREAS, *the use of the serious questions test or any other sliding scale test is contrary to the legislative intent* expressed in section 27-19-201, MCA; and

WHEREAS, the amendments to section 27-19-201, MCA, contained in this legislation *are intended to express the intent of the Legislature that any applications for preliminary injunctions or temporary restraining orders must be based on United States Supreme Court precedent and not on 9th Circuit Court of Appeals decisions*.

2025 Mont. Laws ch. 20, pmbl. (emphasis added).

¶73    The text of HB 409 required that "[w]hen conducting the preliminary injunction analysis, the court . . . may not use a sliding scale test, the serious questions test, flexible interplay, or another federal circuit modification to the criteria." 2025 Mont. Laws ch. 20, § 4(b).  HB 409 was passed and signed by the Governor on March 25, 2025, and was made immediately effective to counter this Court's incursion.  Unfortunately, had the Court not discarded governing interpretive principles in *Stensvad*, including application of the unambiguous plain wording of the statute, and not "insert[ing] what is omitted," *State v. Johnson*, 2022 MT 216, ¶ 13, 410 Mont. 391, 519 P.3d 804 (citing § 1-2-101, MCA), and had it refrained from filling the consequential vacuum with its own creation, the case would have properly been decided pursuant to application of the *Winter* factors.  In short, our duty was to apply the Legislature's words and stop where the Legislature stopped.  Consequently, the Court's decision forced the Legislature to expend its limited time

47

responding to the Court's clear analytical error. To be sure, the exercise of constitutional duties by the legislative and judicial branches will at times produce tension and even disagreement; but that tension should not arise from the failure of the Court to follow the established standards of the law.

¶74 In *State v. Wolfblack*, 2024 MT 166, 417 Mont. 376, 553 P.3d 9, the Court considered whether a criminal sentence that ran consecutively, as a matter of law, with another of the defendant's sentences, should, upon sentence revocation and resentencing, continue to run consecutively with the other sentence. The Legislature had clearly expressed its intention, providing that the time to be served under a second sentence "may not be merged" with time to be served in the first sentence unless those sentences were expressly ordered to be served concurrently at the time of the original sentencing, which had not occurred in that case. Section 46-18-401(1), MCA (2023). The answer to the question before the Court should have been obvious, and has been so understood by sentencing courts: because the sentences ran consecutively prior to revocation, so too would the new revocation sentence imposed in replacement of the original sentence. However, the Court set aside this authority and instead held that the new revocation sentence in that case would run *concurrently* with the other sentence, notwithstanding the prior designation of the sentences as consecutive, because the question should depend on the timing of the revocation sentences. *See Wolfblack*, ¶ 14. The Court was alerted by the separate opinion to the error in its reasoning, and to the confusion that would ensue:

> The Court's ruling requires consecutive sentences to be switched to concurrent sentences upon revocation, in contradiction of § 46-18-401(1)(b), MCA. . . . *It also results in an absurdity*: a defendant who violates his

48

consecutive sentences would receive the benefit of having his sentences changed to concurrent sentences upon entry of his revocation sentence, as a matter of law. The Court cites no authority, and there is none, that would permit consecutive sentences to be changed to concurrent sentences upon revocation of a sentence following a defendant's violation—regardless of the Court's attempt to tie this result to the timing of the revocation sentence. Opinion, ¶ 14. *This decision will no doubt create confusion and disarray regarding revocation sentences*.

*Wolfblack*, ¶ 23 (Rice, J., dissenting) (emphasis added).

¶75 There was an immediate legislative effort in response. House Bill 612 was introduced in the 2025 Legislature to remedy the inevitable confusion in sentencing caused by *Wolfblack* and to restore the Legislature's original intent. HB 612 was entitled: "AN ACT PROVIDING IF A SENTENCE IS REVOKED THE NEW SENTENCE MUST RUN CONSECUTIVELY TO ANY EXISTING SENTENCE UNLESS THE ORIGINAL SENTENCE RAN CONCURRENTLY"—a seemingly unremarkable re-statement of what was current law, except that the Court had departed from it. 2025 Mont. Laws ch. 324. Sponsor Rep. Greg Overstreet introduced the bill in the House Judiciary Committee by offering that HB 612 was necessary "to fix something the Supreme Court did in a case called *Wolfblack*. . . . In essence, the Supreme Court conflated concurrent and . . . consecutive criminal sentences." *Hr'g on HB 612 Before the H. Judiciary Comm.,* Video Recording at 09:39:50-09:40:19, 69th Leg., Reg. Sess. (Feb. 26, 2025). Proponent Mardell Ployhar, Assistant Attorney General, provided a detailed explanation, adding:

[HB 612] is intended to clarify the way in which sentences should be calculated if a defendant has a suspended sentence revoked and the defendant has more than one sentence. This bill has become necessary since the Montana Supreme Court's decision in *State v. Wolfblack* in 2024. . . . [That] holding was contrary to the general understanding that attorneys and courts have had of sentencing law.

*Hr'g on HB 612 Before the H. Judiciary Comm.,* Video Recording at 09:41:24-09:42:13, 69th Leg., Reg. Sess. (Feb. 26, 2025). HB 612 passed both chambers and was signed into law on May 1, 2025. 2025 Mont. Laws ch. 324.

¶76 A reader may wonder how the Court could so badly miss such an obvious question. Could it be that the Court, in eschewing controlling authority, backfilled the resulting vacuum by allowing its own preferred policy preferences to seep into the decision? In my view, the Court has been pursuing policy objectives of more leniency in criminal sentencing, including shorter sentences, and abrogation or reduction of fines, in opposition to the Legislature's adopted policies. Before the messenger is shot, it should be understood that this is not my assessment of the Court; it is the Court's assessment of itself, articulated numerous times, at length. *See, e.g., State v. Gibbons*, 2024 MT 63, ¶¶ 55-56, 416 Mont. 1, 545 P.3d 686 ("A poor offender feels the impact of any fine disproportionately compared to his wealthier counterpart. . . . Mandatory minimum fines thus disproportionately impact minority communities and people of color. . . . [T]he symbiotic harm from mandatory minimum fines affects the women in an offender's family—the mother, wife, or sister pays the fine for their loved one and there is less money for food, clothing, and shelter. . . . When the public expresses fear of victimization and a belief that criminals are not receiving a harsh enough punishment, there is a tendency to respond in kind with new crimes and stiffer penalties."); *City of Whitefish v. Curran*, 2023 MT 118, ¶ 46, 412 Mont. 499, 531 P.3d 547 (McKinnon, J., dissenting) ("Monetary sanctions, although perhaps imposed uniformly and thus appearing to be fair and equal, are mechanisms for entrenching and perpetuating the inequalities and disparities that already exist in society. Those

economically disadvantaged, which have proven to be marginalized populations, disproportionately bear more 'pain' from punishment for their crimes than do those less destitute. Monetary sanctions are therefore a central mechanism of inequality in the criminal justice system that serve to entrench and deepen the inequalities already present in a market-based society."). I could cite to other recent decisions that were decided in a manner consistent with these policy concerns, but the point is that judicial efforts to pursue policies to address perceived societal inequities and wrongs necessarily invade the provinces of the legislative and executive branches, and are an inappropriate basis for judicial decisions, particularly in substitution for established governing legal authorities.

¶77 In *Gibbons*, the above-quoted policy concerns were cited by the Court in striking down a DUI sentencing statute, applicable to fifth and subsequent DUI convictions, which imposed a mandatory fine. The statute had been applied for 27 years under our Court's consistent position that this mandatory fine for extreme offenses was properly applied and not subject to the sentencing court's discretionary assessment. However, the Court was unmoved by the decades of consistency and stability. Instead, it overturned our long precedent distinguishing mandatory fines from discretionary fines so that it could strike down its newly minted statutory interpretation as unconstitutional. *Gibbons*, ¶ 79 (Rice, J., dissenting). The *Gibbons* holding has already been challenged as incorrect with a request that it be overruled, and for additional reasons the Court did not consider in its opinion. Because that issue is now pending before the Court in a different case, I will not discuss it further here.

51

¶78 These cases are sufficient to demonstrate the stated concern, which we are once again seeing in the case before us today. The Court is imposing a new framework for attorney fees in right to know cases, inconsistent with a statute that provides no such scale-tipping presumption, contrary to the Legislature's long acceptance of the statute, and contrary to decades of our precedent, which afforded the same balance. No one has argued for adoption of such a presumption, and there is no source for it. Thus, again, the Court abandons actual law and backfills the vacuum with its own creation made of whole cloth. The Court offers that it is not "meaningfully curtail[ing]" the exercise of judicial discretion, Opinion, ¶ 18, but this, in my view, is disingenuous. If the Court was not making any "meaningful" change, reversal of the District Court's consideration of the circumstances of this case and its careful exercise of discretion would not be necessary. Rather, and contrary to legislative intent, this decision will precipitously change the landscape for fees in disclosure cases, upsetting the current law's careful balance and consideration of opposing positions, and will inevitably result in the assessment of fees in many more, if not virtually all, cases, including against the Office of the Governor in this case upon remand.

¶79 Concerns about unfairness and inequality may quickly be raised in response to this fee decision. In *Forward Montana v. State*, 2024 MT 75, 416 Mont. 175, 546 P.3d 778, the Court *reversed* the District Court's discretionary *denial* of attorney fees to plaintiffs who had sued a Republican legislature, requiring that fees be awarded under the private attorney general doctrine. *Forward Mont.*, ¶ 46. In so doing, the Court set aside prior reasoning employed by the Court in *Western Tradition Partnership, Inc. v. Attorney*

52

*General of Montana*, 2012 MT 271, 367 Mont. 112, 291 P.3d 545, to *deny* fees to plaintiffs, who had waged far more arduous litigation against a Democratic state administration, under either the Uniform Declaratory Judgments Act or the private attorney general doctrine. *See Forward Mont.*, ¶ 52 (Rice, J., dissenting) ("it is irrefutable that Western Tradition's burden of litigation, including before the U.S. Supreme Court, far exceeded Forward Montana's summary judgment litigation"). In *Barrett v. State*, 2024 MT 86, 416 Mont. 226, 547 P.3d 630, members of the Majority wrote separately to advocate for the *reversal* of the District Court's discretionary *denial* of fees to plaintiffs who had sued a Republican state administration, pursuant to the private attorney general doctrine, and to require that fees be awarded. Today, the Court departs from 50 years of precedent and a plain reading of the governing statute in what will be *MEIC v. Governor* to once again *reverse* a district court's discretionary *denial* of fees to a Plaintiff who had sued a Republican administration of state government in a right to know case, and to create a new presumption that the Republican Defendant here must pay. So what are the Republican Defendant and Republicans in general—and anyone concerned about impartiality—supposed to make of the Court's decision today, especially in view of these prior fee decisions? That this is simply another coincidental Republican defeat in a run of bad case outcomes resulting from the Court's careful application of established legal principles? Or, that this is another case where the Court has jettisoned long-established governing authority and backfilled the vacuum with its own preferences to weaponize the law, whether it be statute or the private attorney general doctrine, against them?

¶80 Words matter, but actions matter more. The justices of the Court have rightly voiced opposition to proposals to make judicial elections partisan, because doing so, we claim, would make the courts political. We profess a desire that courts would operate for the highest purposes and upon the best motivations, including nonpartisanship and neutrality. Why, then, do proposals to change the current system of nonpartisan elections to partisan elections continue to arise year after year? I suspect there are multiple reasons, but the Court may want to consider whether one reason applicable to the Court is explained by the wisdom of Pogo: "We have met the enemy, and he is us." Walt Kelly, *Pogo* (Apr. 22, 1971).

¶81 There are many days that I proudly watch this Court rise to apply the law as the Court finds it, as it has been enacted and endorsed by the Legislature or consistently applied in case precedent, and not as we would prefer it to be, faithful to its application without policy agendas, unaffected by outside influences and neutrally applied regardless of person or party. I am not counting today among them.

¶82 I dissent.

/S/ JIM RICE

Chief Justice Cory J. Swanson joins in the dissenting Opinion of Justice Jim Rice.

/S/ CORY J. SWANSON

Justice Laurie McKinnon, concurring.

¶83 I write separately to address what I deem to be a highly inappropriate and unprofessional attack made by Justice Rice and Chief Justice Swanson upon the Court as an institution, and on the integrity of myself and my colleagues as jurists. Further, I take their attack personally as, in case it is not apparent, I authored all but one of the cases they find themselves at odds with. Neither justice addresses the merits of the decision here; rather, they launch into a tirade pointing to Justice Rice's dissents and claiming this Court is driven by policy and personal agendas. This is particularly disturbing because the dissent's bitter partisan and political attacks on fellow justices and this Court are endorsed by a newly elected Chief Justice, who did not participate in the deliberations, arguments, discussions, or draft opinions that ultimately evolved into the Court's decisions and, therefore, has no basis to deride the motivations of the justices deciding these difficult cases as being political and policy driven. This Court stands at the apex of the judicial branch and is the institution of government charged with protecting the constitutional rights of its citizens. Its nonpartisan role in protecting those rights is undermined when an Associate Justice and, particularly, a Chief Justice make partisan accusations against their colleagues about cases not even before them. What is the public to make of such dissension and dysfunction, and has the dissent jeopardized this Court's legitimacy? Of course they have. What both justices ignore is that when a dissent does not carry the day, the precedent of that case requires that the rule of law still be followed. Some justices might continue to dissent, however few justices would attack those decisions by maligning the motivations of their colleagues. While I certainly do not dispute that the legislature must set policy

55

through its statutory enactments and this Court must uphold those enactments when they are constitutional, I am of the opinion that the integrity and nonpartisan nature of this Court is disturbingly undermined when Justice Rice and Chief Justice Swanson, who was not even privy to this Court's deliberations to those now-impugned cases, rant that a majority of this Court making those difficult decisions did so based on our personal partisan agendas and attempting to establish our own policy.

¶84 I took an oath, not to the Legislature, but to the Montana and federal constitutions. I believe my duty and obligation as a jurist are to the citizens of this State to ensure that the Constitution is abided by, not that legislative enactments are upheld when they are unconstitutional. My decisions, and those of my colleagues with whom the dissent finds fault, followed a diligent, comprehensive analysis of the facts and law of each case. Each decision represented a majority decision of the Court. Those decisions are not at issue, nor remotely relevant to any applicable judicial analysis here. In the not too recent past, despite disagreements among the justices on decisions which were difficult, we, nonetheless, always showed respect for each other and each other's opinions. The decorum and integrity of the Court comes first, and it is lost when a justice writes disparagingly that the Court is partisan and follows a policy agenda. Rarely, if ever, have I seen an attack on the integrity of my fellow colleagues' motivations and judicial decisions that is as vitriolic as in the dissent of Justice Rice and Chief Justice Swanson. And one wonders what the motivation underlying it must be. I have never been in the Legislature, nor do I want to be. My career, education, commitment, and passion, as is true of those justices criticized by the dissent,

has always been to the rule of law, a nonpartisan and independent judiciary, and upholding our constitution.

¶85 There is, however, one thing I agree with in the otherwise invective and unprofessional dissent. This is indeed a sad day for the Court. The bitter and rancid dissent of Justice Rice and Chief Justice Swanson will affect relationships between the justices and undoubtedly be seized upon by those holding the Court in disrepute as further opinion that the Court should be reformed. It is a sad day for the Court because it is an attack by two members on the integrity of their colleagues, the quality of this Court's opinions, and the Court's hard work; work that upholds the independence of the judiciary, the constitution, the rule of law and—in contrast to Justice Rice and Chief Justice Swanson—work for which I am extremely proud. Despite this, I appreciate the dissent highlighting the Court's accomplishments and contributions to the law with which they disagree: it motivates me to keep up my work protecting Montana's Constitution and deciding cases in a nonpartisan manner.

/S/ LAURIE McKINNON

Chief Justice Cory J. Swanson, dissenting.

¶86 I join Justice Baker's Dissent because it is the correct resolution of this case. The District Court Judge applied his formidable intellect and sound judgment to the case record and did not abuse his discretion in denying attorney fees.

¶87 I join Justice Rice's Dissent because it provides a clear-eyed and well-reasoned assessment of where this case fits into the context of the Court's recent caselaw and

jurisprudential methodology on some—not all—occasions. I read and re-read his Dissent, searching in vain for the "unprofessional," "bitter," or other offending content decried by Justice McKinnon. Finding nothing offensive or personal in his criticism, I commend it as a healthy and unflinching self-evaluation of this Court's performance.

¶88 Judges are mere human beings, all fallible. My judicial prayer is that God grant me adherence to clear principles, seasoned with humility and strengthened by a commitment to learning. All human beings have bias, inherent in our world-view and habits of thought. The responsible jurist must subject himself or herself to rigorous examination for bias. This process is aided by appellate review, and the concurrence and dissent from well-educated members of a multi-justice court. No doubt my colleagues will help me in the coming years to identify and discipline my own biases.

¶89 The Concurrences miss the point of Justice Rice's comment regarding partisanship and partisan elections. He is not writing in favor of them, he is cautioning us against them. The more we exhibit bias in our opinions, the more we fuel the accusations of partisanship on the Court, and the more we inadvertently support the calls to cure the ill of judicial bias with even more of the same. I join his concern and reinforce his caution.

¶90 As has been much discussed publicly, I have spoken against partisanship on the Court and I adamantly disagree that it will cure the disease of bias. It would merely provide an avenue for a known bias—political party affiliation—to overcome an existing bias which eludes a label and evades detection by many voters. But merely voicing opposition to partisanship means nothing unless the Court actually practices self-restraint and self-discipline to confine itself to its constitutional role and follow its own rules of legal

interpretation and standards of review. The real culprit is not just bias, it is *activism*. Activism is the vehicle which gives life and expression to bias. Whether liberal or conservative, activism is a greater threat to judicial legitimacy and authority than the political criticism of this era or the judicial criticism of this Dissent.

¶91 I appreciate the spirit and substance of Justice Shea's Concurrence, and I agree with him this Court owes clearer guidance to the district courts on many issues, perhaps including this one. I disagree this is the appropriate case to pronounce this rule, or even that the rule is correct, as Justice Baker has so ably explained. I also agree with Justice Shea's view that the make-up of the Court, including its odd number of seven members, contains a built-in assumption that we may sincerely and even heatedly disagree. But at the end of the day, we need four votes to render a majority decision.

¶92 This illustrates why I was required to vote and express my opinion on this case, despite Justice McKinnon's criticism. Careful observers of this case's history already understand it was classified to a five-justice panel in 2024, without the inclusion of retiring Chief Justice McGrath or Justice Sandefur. The original five could not reach a majority decision, so the case went en banc—meaning Justice Bidegaray and I joined the discussion and Opinions when we came on the Court. Our presence on this case is not illegitimate or inappropriate in any way. It is a constitutional necessity to reach a majority vote. Mont. Const. art. VII, § 3(1). Justice McKinnon does not complain about Justice Bidegaray's vote; had I merely joined Justice Baker's Dissent, I doubt there would have been a complaint.

¶93 Which leads to my concluding thoughts on my role as Chief Justice, again in response to Justice McKinnon's criticism that joining Justice Rice's Dissent is inappropriate for the Chief. This office requires me to advocate for the Judicial Branch as a whole, and I enthusiastically do so with full faith and conviction this institution is an essential co-equal branch necessary for the proper functioning of our Republic. That means defending the branch from encroachments on its power or prerogatives, and supporting each member and employee of the Judiciary to fulfill his or her duty, for the good of the people we serve.

¶94 But my leadership role also means helping the Judicial Branch improve. Like any collection of individuals, we have successes and failures. Improvement requires identifying, acknowledging, understanding, and learning from our mistakes. That is not an attack upon the Judiciary or any of its members. On the contrary, it is an act of love and loyalty to who we are and who we can be. And in my view, it is the best way for the Judiciary to reform itself by achieving constitutional balance: respect the authority and prerogatives of the political branches to make law without surrendering the Judiciary's power to interpret the law.

¶95 We are seven co-equal Justices when it comes to writing Opinions. We agree with each other far more than we disagree. And after more than a hundred published Opinions this year, this is the first occasion when these differing views on the Court's methodology have inflamed our public conversation. If anyone bothers to read this already way-too-long Opinion, they may make political hay of it. We cannot control that narrative, we can only do our duty as we understand our duty. And while collegiality and agreement with my

colleagues is dear to me, the truth is dearer still.[1]  So being Chief Justice does not prevent me from articulating my interpretation of the laws and Constitution, even if it rocks the boat.  It is my duty.

/S/ CORY J. SWANSON

---

[1] "Plato is dear to me, but dearer still is truth." – Aristotle